FEDERAL COLD STORAGE COMPANY, Appellant, v. ANTHONY PUPILLO, Doing Business as PUPILLO FRUIT COMPANY.—139 S. W. (2d) 996.

Division One, May 7, 1940.*

*NOTE: Opinion filed at September Term, 1939, March 6, 1940; motion for rehearing filed; motion overruled at May Term, 1940, May 7, 1940.

*Edwin A. Smith* for appellant.

138

*Joseph P. Waddock* and *Roessel & Minton* for respondent.

BRADLEY, C.—Plaintiff sued in separate counts to recover on six promissory notes payable on demand, and, on a 7th count, sought

recovery on an account. The notes were executed November 1, 1935, and were for $729 each, and bore interest at 6% prior to demand, and 8% thereafter. The account was in the sum of $1456.02, and was for storage charges, insurance, etc. Defendant answered by a general denial, and a separate counterclaim to each count of the petition. Defendant stored seven carloads of grapes with plaintiff and borrowed money thereon. Seven of the counterclaims are based on damage to the grapes alleged to have been caused by plaintiff's negligence, and the 8th counterclaim was based on an alleged conversion of apples belonging to defendant and stored with plaintiff. So far as pertinent here, the reply was a general denial, and a plea that whatever loss defendant sustained "was entirely due to his own negligence, in that he knew, or by the exercise of ordinary care and reasonable diligence and inquiry could have ascertained, that the 1935 crop of California Emperor grapes was not a good crop for storing in cold storage, especially the length of time he kept said grapes in cold storage, for the reason that said crop of California grapes was damaged by rain and early frost before it was harvested, thereby greatly impairing the keeping quality of said crop. Furthermore, defendant was contributorily negligent, in that he failed and neglected to sell said grapes at the proper time, to-wit, during November and December, 1935, particularly after his attention was called to them by the plaintiff on many occasions orally and by letters and special inspection reports."

At the close of the whole case defendant dismissed as to the 7th counterclaim. The jury found for plaintiff on each count of the petition, and in the total sum of $5909.26, and for plaintiff on defendant's 8th counterclaim, and found for defendant on each of the first six counterclaims, and in the total sum of $7559.79. Judgment, at first, was entered against plaintiff and in favor of defendant for $1650.53, the difference between the respective total findings for plaintiff and defendant. The verdict was returned May 14, 1937, and on May 17, three days later, defendant filed motion "to modify and amend" the judgment by deducting $1608.91 from the total finding for plaintiff. The motion to modify was sustained on the day filed and a final judgment was entered against plaintiff for $3259.44, and this appeal followed.

The appeal was granted to the St. Louis Court of Appeals, and on motion, in that court, by defendant, the cause was transferred to this court. Plaintiff filed motion here to transfer back to the Court of Appeals, which motion was overruled. Plaintiff appealed, therefore, the amount in dispute is the total finding ($7559.79) in favor of defendant on his counterclaims. In the situation, jurisdiction of the appeal is clearly in this court (Const., Art. 6, Sec. 12; Sec. 3, Amendment 1884; Sec. 1914, R. S. 1929, Mo. Stat. Ann., p. 2587).

Plaintiff, appellant here, assigns error (1) on overruling its demurrer to the counterclaims; (2) on the refusal, at the close of the whole case, of a demurrer to the evidence offered in support of the counterclaims; (3) on the admission and exclusion of evidence; (4) on the instructions; (5) on the modification of the judgment; and (6) on the court's action in permitting certain exhibits to be sent to the jury after deliberation commenced.

In four of the counterclaims, dealing with four carloads of these grapes, loaded by plaintiff from its storage warehouse for delivery back to defendant, and shipped, one car each, to Chicago, Cleveland, Pittsburgh, and New York, defendant pleaded three separate acts of negligence, viz.: (1) That plaintiff "negligently and carelessly failed to store said grapes in a room, the temperature of which was continuously maintained at a suitable degree for the preservation of said grapes in a sound and merchantable condition;" (2) that plaintiff "carelessly and negligently stored said grapes in a room, the temperature of which was permitted to fluctuate and remain for long periods of time at a temperature unsuited to the preservation of grapes in good, sound and merchantable condition;" and (3) that plaintiff negligently and carelessly failed "to properly strip the containers of said grapes for ventilation while in said car," and carelessly failed to "stow and secure said containers so as to prevent shifting and breaking while in" transit. In the other two counterclaims involved on this appeal, defendant pleaded only the first and second acts of negligence above stated.

The demurrer to the counterclaims alleges failure to state a cause of action. About all that plaintiff suggests in support of this demurrer is that it was not an insurer. Manifestly, there is no merit to the demurrer to the counterclaims, and we pass to the assignment on the sufficiency of the evidence. All three of the alleged acts of negligence were submitted as to the four cars loaded by plaintiff from its cold storage warehouse and shipped to Chicago, etc., but as to the other two carloads of grapes, only the first two charges of negligence were submitted. The first two charges of negligence concern the subject of temperature in plaintiff's storage warehouse, and we shall consider these charges together.

Defendant is a wholesale dealer in produce, fruits, etc., in St. Louis, and plaintiff is engaged in the cold storage business in St. Louis. October 22 to 25, 1935, defendant purchased these grapes, through a broker in St. Louis, from Nash-DeCamp Company, San Francisco. The grapes were grown and loaded in the vicinity of Exeter, California, and were shipped to St. Louis, and stored (October 31 to November 2) with plaintiff. Defendant's evidence tended to show that the temperature of the grapes should have been maintained around 31 to 32 degrees, and defendant contends that he had substantial evidence tending to show that the temperature in plaintiff's

warehouse, where the grapes were stored, ranged from 30½ to 36, and that the high temperature was of such duration which, taken with the temperature fluctuation, caused the damage the grapes suffered in storage.

The grapes were stored in room 64, 6th and top floor of the building, and were stored in the original lugs or boxes in which shipped. As we understand, the room was about 200 feet north and south, 75 feet east and west, ceiling 13 feet, and was in 3 sections. There was an east aisle and a west aisle, about 4 feet each in width. The east aisle was immediately west of the east section, and the west aisle was immediately east of the west section. The middle section was about 22 feet in width, and according to a refused offer of proof, contained apples. Defendant's grapes were stored in the west section, and in tiers some 6 or 7 lugs high, beginning about one foot above the floor. There was a thermometer, about 5½ feet from the floor, at the north and south ends of the east aisle, and these thermometers were about 28 feet from the grapes. Also, there was a thermometer, on a stand under the grapes at the north and south ends and just off the west aisle. The two thermometers in the east aisle were read daily at 7 A. M., 10 A. M., 1 P. M., 4 P. M., 7 P. M., 10 P. M., 1 A. M., and 4 A. M., and the thermometers under the grapes were read (called special readings) from 3 to 5 times every twenty-four hours, but not at regular hours as were the east aisle thermometers.

Joseph P. Waddock, counsel for defendant, had a conference (February, 1936) with R. C. Taylor, plaintiff's vice president and general manager, and at that time, Taylor showed Waddock the temperature sheets for room 64, and Waddock made pencil notes of the daily high and low readings of the thermometers in the east aisle. From these notes he had made a typed take-off, called the typed list, which showed the daily high and low readings of the east aisle thermometers. Also, he made a graph showing the same high and low readings. Neither the list nor the graph showed the *hour* of reading. The typed list and graph were introduced in evidence.

Over the storage period, the graph shows the high temperature as follows: October 30, 31, 34½; November 1, 36; November 2, 3, 4, 5, 35½; November 6, 34; November 7, 33½; November 8, 9, 10, 34; November 11, 33; November 12, 33½; November 13, 33½; November 14, 32½; November 15, 33; November 16, 17, 18, 33½; November 19, 33; November 20, 21, 33½; November 22, 34; November 23, 33½; November 24, 34; November 25, 34½; November 26, 35; November 27, 28, 29, 30, 34½; December 1, 2, 34; December 3, 4, 33; December 5, 33½; December 6, 7, 33; December 8, 33½; December 9, 10, 11, 12, 34; December 13, 32½; December 14, 32; December 15, 16, 32½; December 17, 32; December 18, 19, 20, 21, 32½; December 22, 23, 24, 25, 26, 27, 32; December 28, 29, 30, 31, 31; January 1, 32; January 2,

31½; January 3, 4, 32; January 5, 32½; January 6, 32; January 7, 32½; January 8, 33½; January 9, 10, 11, 33.

Over the same period the graph shows the low temperature as follows: October 30, 31, 32; November 1, 32½; November 2, 3, 32; November 4, 32½; November 5, 33; November 6, 32; November 7, 30½; November 8, 31; November 9, 31½; November 10, 32; November 11, 31½; November 12, 32; November 13, 31½; November 14, 31; November 15, 32½; November 16, 17, 33; November 18, 32; November 19, 20, 21, 33; November 22, 32; November 23, 24, 25, 33; November 26, 32½; November 27, 32; November 28, 29, 32½; November 30, 32; December 1, 31½; December 2, 3, 32; December 4, 32½; December 5, 6, 31; December 7, 32; December 8, 32½; December 9, 10, 33; December 11, 12, 32½; December 13, 14, 31½; December 15, 16, 32; December 17, 31½; December 18, 19, 20, 32; December 21, 22, 23, 24, 25, 26, 27, 31½; December 28, 29, 30, 31, 31; January 1, 31; January 2, 3, 4, 31½; January 5, 32; January 6, 31½; January 7, 32; January 8, 9, 10, 32½; January 11, 32.

Plaintiff introduced its temperature sheets showing the eight daily east aisle thermometer readings, and the special readings, from 3 to 5 times every 24 hours, of the thermometers under the grapes. The special readings were commenced November 5, 1935, and over the storage period, the highest was 32½ and the lowest 30½, and out of 438 special readings from the two thermometers under the grapes, a high of 32½ was reached, according to the readings, only 33 times, and these were over the period from November 11 to January 8.

The record shows that, because of the sugar content of these grapes, they would not freeze until the temperature was down around 26. Also, it appears that it requires a few days after grapes are stored to bring their temperature down to proper storage temperature. The temperature sheets show that on November 5, the readings of the north end east aisle thermometer were 33 at 7 A. M.; 34 at 10 A. M.; 33 at 1 P. M.; 35½ at 4 P. M.; 35 at 7 P. M.; 34 at 10 P. M.; 33½ at 1 A. M.; and 33½ at 4 A. M. And the readings of the south end east aisle thermometer for these same hours were 34, 34, 34, 35½, 34½, 33½, 33 and 33½. On the same day, November 5, the readings of the north thermometer under the grapes were 31½ at 7:30 A. M.; 31½ at 9:45 A. M.; and 31½ at 12:45 P. M. The readings of the south thermometer under the grapes, same date, same hours, were 31½, 31 and 31. On November 22 the east aisle north thermometer for the 8 readings, at 7 A. M., etc., were 33½, 34, 33½, 33½, 33½, 32, 32, 33, and for the east aisle south thermometer, same date, same hours, the readings were 33, 33½, 33½, 33½, 33½, 33, 32, 32½. On same date, the readings of the north thermometer under the grapes were 31 at at 4 P. M.; 31½ at 7 P. M.; 32 at 10 P. M.; and 31½ at 1 A. M., and the readings of the south thermometer under the grapes, same date, same

hours, were 31½, 31½, 31½, and 31½. November 26, north thermometer, east aisle, the 8 readings at 7 A. M., etc., were 33½, 34, 32½, 32½, 33, 33, 33, and 33, and the readings, same date, same hours, south thermometer, east aisle, were 34½, 35, 33½, 34, 34½, 34½, 34½, and 34½. On the same date, the readings of the north thermometer under the grapes were 31 at 12:30 A. M.; 31 at 9:45 A. M.; 31 at 12:45 P. M.; 31 at 3:45 P. M.; and 31 at 6:15 P. M., and the readings of the south thermometer under the grapes, same date, same hours, were 32½, 32, 32, 32, and 32. We have taken November 22, and 26, at random, so to speak, and it appears from the temperature sheets that about the same difference between the temperatures, shown by the east aisle thermometers and by the thermometers under the grapes, appears daily from November 5 to the end of the storage period.

Defendant's witness, L. G. C. Pierce, was a fresh fruit and vegetable inspector for the U. S. Department of Agriculture, and had been for 13 years, and had, through the years, inspected, before and after storage, the kind of grapes here involved. Pierce testified that these grapes in storage should have been "kept at a temperature between 31 and 32 or as close to that as possible." Witness Pierce was shown the graph and was told by counsel that it represented "the high and low temperatures at which the grapes in this particular lawsuit were kept over the period of their storage," and was asked: "What, in your opinion, would be the effect of that degree of variation and fluctuation (36 highest to 30½ lowest as shown on the graph) in temperature, high and low, for each respective day with respect to the keeping qualities of the grapes subjected to that temperature?" Pierce answered: "The grapes, as I have stated, should have been kept at a fairly uniform temperature, 31 and 32. If the temperature fluctuates up or down it's bound to have effect on the grapes themselves. As I have stated, the gray mold, of which decay, I suppose, predominates in this case, can be controlled fairly well below 32. It will grow as the temperature increases and for that reason it should be held down around 31, 32 degrees."

And Pierce further testified: "Q. What effect would that particular type of variation have upon the development and growth of blue mold? A. It would help to start blue mold. Q. I will ask you to state whether or not it is a fact that blue mold, for all practical purposes, can be readily controlled between 31 and 32? A. Yes, sir; that's true."

Defendant's witness, Glenn Blaine Ramsay, by deposition, testified that he was senior pathologist for the Bureau of Plant Industry, U. S. Department of Agriculture; had been with the Department 18 years, and was located in Chicago. He was engaged in the investigation of fruit and vegetable diseases, particularly in transit and storage. He testified that "when the proper refrigeration temperature is reached it is important to have the control uniform. That is, the

144

temperature of a uniform degree. Q. In other words, when that uniform temperature has been arrived at on the basis of experience or on the basis of investigation, temperatures varying above that too high or below that too low have a material effect upon the keeping qualities and the preserving of the fruits and vegetables of plant life that is involved; is that right? . . . A. That would depend on the product and on the type of disease involved. Q. As a general proposition —in other words—what is your opinion as to the effect of temperatures that are too high in so far as deterioration is concerned? A. As a general proposition, the fungi and bacteria which caused the deterioration thrive and cause deterioration more rapidly as the temperature rises. Q. And, if the temperature is too low, then the product is frozen and it has a detrimental effect upon it? A. Yes; naturally.''

Ramsay also testified that "the Department of Agriculture generally considers the proper storage temperature (for grapes) to be 31 to 32 degrees. Fahrenheit. . . . Q. And is there any particular temperature control for the regulation of blue mold? What temperature is it? A. Well, blue mold is generally well controlled in temperatures of 32.'' Ramsay was shown "the memorandum Mr. Waddock made,'' and was asked: "Q. Now, doctor, calling attention particularly to the first ten days, I ask you to state whether or not, in your opinion, the temperature fluctuation and variation reflected by that is one that might very apt or very probably have a decided effect upon the growth of the plant disease and upon the keeping qualities of the grapes.'' Objection was made, and the witness was told by counsel that "for the purpose of the question you can assume this was a carload of clean grapes; they were in a good condition and in lugs face down. The question should be what is your opinion about those temperature readings for the first month and particularly for the first ten days in that month as indicated by the temperature chart indicated or marked 'defendant's exhibit 13'? A. The temperature ranged as high as 36 degrees, so four days ranging to 35½ in succession would favor development of the disease of grapes.'' Ramsay testified that "generally speaking, if the temperature is to fluctuate sometime during the storage period it probably would be a little less damaging toward the middle or latter half than it would be in the first.''

According to the temperature sheets, there were 1248 readings of the east aisle thermometers, counting both, and these sheets show that a high of 36 was reached only on one day, and that was at 1 P. M., November 1, south thermometer, and at same time the north thermometer showed 33. November 2, at 4 P. M., 7 P. M., 1 A. M., and 4 A. M., the south thermometer, east aisle, registered 35; at same hours, north thermometer, east aisle, registered 32½, except at 1 A.' M., when it was 32. Neither of the east aisle thermometers showed as high as

35 after November 5 (except at 10 A. M., November 26, south showed 35).

Defendant, in presenting a hypothetical question to Ramsay, gave the temperature situation as follows: ". . . they (the grapes) were kept in this warehouse two months and ten days, and that during the first ten days of this period there were daily fluctuations in temperature of from 30½ to 36 degrees Fahrenheit, and that on four (five) days hand running the variation of the 32 to 35½ degrees Fahrenheit, that during the remainder of this month there were fluctuations of from 1½ to 3½ degrees, that on twenty-five days the temperature, high, was over 34 degrees and as high as 36, and on fourteen days the lowest temperature was 32½ to 33 degrees. . . ."

The question, by no means, gave the true situation as to the temperature, even from the east aisle thermometers, and means, as we read, that 36 was reached on 25 days. And besides this, the variation from 32 to 35½ on the five days "hand running" was on November 1, 2, 3, 4, and 5, immediately after the grapes were placed in storage. Also, all this evidence as to the temperature relied on by defendant, was taken from the east aisle thermometers, 28 feet from the grapes, while the temperature at the section where the grapes were stored, as shown by the thermometers at the north and south end of the section, was, at the hour read, never higher than 32½ or lower than 30½, and was not as high as 32½ except from 33 readings out of 438.

It is conceded that plaintiff's liability for any damage to the grapes on account of storage temperature is measured by Sec. 14394, R. S. 1929, Mo. Stat. Ann., p. 8192, which provides that "a warehouseman shall be liable for any loss or injury to the goods caused by his failure to exercise such care in regard to them as a reasonably careful owner of similar goods would exercise, but he shall not be liable, in the absence of an agreement to the contrary, for any loss or injury to the goods which could not have been avoided by the exercise of such care." [See also 27 R. C. L., p. 991, sec. 50; 67 C. J. 495; 55 A. L. R. (Ann.) 1104.]

We do not think that defendant's evidence on the issue of storage temperature was substantial. It would be, in our opinion, wholly within the realm of speculation to say that the temperatures shown by the east aisle thermometers, 28 feet away from these grapes, was substantial evidence tending to show that plaintiff was negligent in maintaining the proper storage temperature. A verdict based on such speculation will not be permitted to stand. To support recovery the evidence must remove the case from "the field of speculation." [Carner v. St. L.-S. F. Ry. Co., 338 Mo. 257, 89 S. W. (2d) 947, l. c. 952; Watkins v. Bird-Sikes-Bunker Co., 322 Mo. 830, 16 S. W. (2d) 38, l. c. 43; State ex rel. Gosselin v. Trimble et al., 328 Mo. 760, 41 S. W. (2d) 801, l. c. 805, and cases there cited.]

We shall not prolong this opinion by setting out the evidence on the question as to whether or not defendant made a submissible case on the charge that the grapes in the cars loaded by plaintiff for shipment out of St. Louis, were damaged by plaintiff's failure to properly load and to strip. It is sufficient, we think, to say that, in our opinion, defendant made a submissible case under the third alleged ground of negligence. In the situation, as we see it, there is no other question for disposition on this appeal.

In the prayer of the reply plaintiff prayed "judgment against the defendant in accordance with the various counts, 1 to 7, both inclusive, of its petition," less the credit of $1608.91, and in the instructions plaintiff asked that if the findings were for plaintiff as asked, then the $1608.91 would be deducted. The jury found for plaintiff on the seven counts of its petition and in the sum asked, and in the total sum of $5906.26, as stated, but failed to deduct the $1608.91. In the situation there is no ground to complain on the deduction of the $1608.91. Also, it appears that no defense was made to plaintiff's case on the notes and on the account. The controversy was waged on the counterclaims.

The judgment should be reversed and the cause remanded for retrial on defendant's third ground of alleged negligence, and upon disposition of defendant's case on said third ground of alleged negligence, the court will deduct the $1608.91 from the $5909.26, the total finding for plaintiff, and then, figuring interest, render such judgment as should be rendered. It is so ordered. [See Keller v. Keller, 338 Mo. 731, 92 S. W. (2d) 157, l. c. 164, and cases there cited.]

*Hyde* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.