Arthur C. ELMORE, et al., Appellants,

v.

OWENS–ILLINOIS, INC., Respondent.

No. 65374.

Supreme Court of Missouri,
En Banc.

June 19, 1984.
As Modified July 17, 1984.
Rehearing Denied July 17, 1984.

Thomas A. Sweeny, John M. Klamann, Kansas City, for appellants.

Truman K. Eldridge, Jr., Louis A. Huber, III, Kansas City, for respondent.

Roy A. Larson, Thomas R. Larson, David E. Larson, Kansas City, for Raymark Industries.

Laura D. Stith, W. James Foland, Gary C. Robb, Kansas City, for Westmo Defense Lawyers Assoc.

HIGGINS, Justice.

Arthur Elmore and his wife Mary sued Owens-Illinois, Inc., for damages alleged to have resulted from Mr. Elmore's prolonged exposure to asbestos dust; Owens-Illinois manufactured Kaylo, an insulating material that contained asbestos. The jury returned verdicts of $117,250 for Mr. Elmore and of $43,750 for Mrs. Elmore. The trial court reduced the verdicts to $17,250 and $7,750, respectively, on the ground that the jurors had misunderstood the court's instructions on the computation of total damages and entered judgment for plaintiffs accordingly. All parties appealed, and the Court of Appeals, Western District, affirmed liability of Owens-Illinois and reversed the reduction of plaintiffs' damages.

This Court granted transfer to examine the admissibility of a state of the art defense in a products liability action and reaches the same result as did the Court of Appeals.

Owens-Illinois asserts that the plaintiffs' claims were barred by the two-year statute of limitations of the State of Kansas; that the substantive law of Kansas should apply; that the plaintiffs' case should have been submitted upon an instruction reflecting a "failure to warn" theory of products liability, rather than an instruction reflecting a "product defect" theory; that such an instruction would have afforded Owens-Illinois the opportunity to assert a state of the art defense; and that modification of the jury's verdicts was proper. Plaintiffs counter that Missouri's five-year statute of limitations was properly applied; that the trial court properly applied Missouri law; that the evidence was sufficient to support a "product defect" instruction; that a state of the art defense is irrelevant in a design defect case; and that the trial court erred in reducing the jury's verdicts.

This Court draws freely from the opinion written by the Honorable Don W. Kennedy for the Court of Appeals.

Arthur Elmore followed the asbestos workers' trade from 1943 until his retirement in 1976. Between 1948 and 1958 he often worked with a material known by the trade name of "Kaylo," manufactured and distributed by defendant Owens-Illinois. This product was a solid material two and a half to three inches thick, used to insulate pipes, boilers, turbines and the like. It came in blocks of various shapes and sizes. Its installation required pounding and sawing, often in enclosed places, which raised considerable dust. Workers, such as Mr. Elmore, were exposed to and breathed the dust. Kaylo was composed of several materials, including 15% asbestos.

Mr. Elmore learned through union publications in the late 1960's of the danger of working with asbestos; it could cause asbestosis. At about the same time asbestos products began to carry warnings, and beginning about 1970 asbestos was removed

from many of the products. Elmore began to be short of breath, a symptom of asbestosis, in 1973; his asbestosis was not diagnosed until May 13, 1976.

Asbestosis may result from breathing asbestos dust; it is not argued that the evidence was insufficient to establish causation. Asbestosis is detectable from as early as four years to as long as twenty years after the exposure, with the 15-to-20 year latency period being more common.

The case was submitted on a strict liability theory, MAI 25.04.

Under its assertion that plaintiffs' claims were barred by Kansas' two-year statute of limitations, defendant maintains that the Kansas statute of limitations is applicable because the cause of action "originated" in Kansas. Missouri's borrowing statute, section 516.190, RSMo 1978, provides: "Whenever a cause of action has been fully barred by the laws of the state, territory or country in which it originated, said bar shall be a complete defense to any action thereon, brought in any of the courts of this state."

Plaintiffs respond that the cause of action "accrued" in Missouri at the time of the diagnosis of asbestosis on May 13, 1976. Suit was filed May 10, 1979, well within the five-year limitations period of section 516.120, RSMo 1978, the Missouri statute of limitations.

■ Within the context of section 516.-190, "originated" has been accorded the meaning "accrued." *Schnabel v. Taft Broadcasting Co., Inc.*, 525 S.W.2d 819, 826 (Mo.App.1975). A cause of action accrues when and originates where damages are sustained and are capable of ascertainment. *Renfroe v. Eli Lilly & Co.*, 686 F.2d 642 (8th Cir.1982).

■ Although Mr. Elmore knew as early as 1973 that he had shortness of breath, and knew also, from reading publications of his union, that long-term breathing of asbestos dust caused asbestosis, he did not know that his condition was asbestosis until it was diagnosed by his physician on May 13, 1976. It was not until such diagnosis was made that the character of the condition (asbestosis) and its cause (breathing asbestos dust) first "came together" for the plaintiff. Thus, plaintiffs' cause of action accrued on May 13, 1976, the date of the diagnosis made by his doctor at her office in Kansas City and was not barred by Missouri's five-year statute, the appropriate statute of limitations.

■ Defendant asserts that the substantive law of Kansas should have been applied; and that under Kansas law plaintiffs must prove that at the time defendant sold Kaylo it knew or could have known that the product was unreasonably dangerous, and that an alternative safe design was technically feasible. Plaintiffs respond that Missouri law was properly applied, and that, alternatively, Kansas law is the same as Missouri's on this point.

In *Kennedy v. Dixon*, 439 S.W.2d 173, 184 (Mo. banc 1969), this Court adopted the rule of Restatement (Second) of Conflict of Laws section 145 (1971) for determining the substantive law to be applied in tort cases. Section 145 provides: .

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

   (a) the place where the injury occurred,

   (b) the place where the conduct causing the injury occurred,

   (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

   (d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Defendant emphasizes plaintiffs' domicile in Kansas in its nomination of Kansas

as the state whose law is to be applied, and likens this case to a defamation case where there is widespread publication, in which case residence is the most important consideration. Restatement (Second) of Conflict of Laws § 150(2) (1971). But defamation produces a special kind of injury that has its principal effect among one's friends, acquaintances, neighbors and business associates in the place of one's residence. An injury from defamation, therefore, does have a center in one's place of domicile. A disease, however, has no significant relationship to the place of one's residence; it goes with the victim wherever he goes. Thus, there is no overriding significance to Mr. Elmore's place of residence.

Mr. Elmore's employment during the 1948–58 period, the 10-year period during which defendant manufactured Kaylo, was principally for Missouri-based employers. Although he was from time to time employed by employers based in several different states, the ratio between social security wages paid to him by Missouri employers and those paid to him by Kansas employers was 17 to 1. Four of his main employers during those years were Kansas City Insulation Company, Williams Insulation Company, Inc., Kelley Asbestos Products Company, Inc., and Standard Asbestos Manufacturing and Insulating Company, all with headquarters in Kansas City, Missouri. During the entire period of his employment he was a member of Asbestos Workers Local No. 27 in Kansas City, Missouri, which assigned him to the various jobs.

Of the contacts listed under subsection 2 of section 145, "the place where the relationship, if any, between the parties is centered" has the greatest relative importance with respect to the particular issue. That place was Kansas City, Missouri. Mr. Elmore's injury was intimately and inextricably involved with his employment. That his employment was chiefly for Kansas City-based employers, out of his Kansas City union, makes Kansas City the place where plaintiff Arthur Elmore and defendant Owens-Illinois came in contact through the product Kaylo. The trial court properly applied Missouri law.

Defendant argues that the plaintiffs' case should have been submitted upon MAI 25.05, Strict Liability-Failure to Warn, instead of MAI 25.04, Strict Liability-Product Defect. It asserts that under a failure-to-warn theory it would have been entitled to present a "state of the art" defense: that defendant could not reasonably have been expected before 1958, the date it ceased to manufacture Kaylo, to know of Kaylo's danger to workers, and could not have warned anyone of that danger; therefore, it should not be held liable. It argues that the trial court's failure to instruct on MAI 25.05 was error.

It is a plaintiff's prerogative to choose the theory upon which he will submit his case, so long as that theory is supported by the pleadings and the evidence. *Robinson v. St. John's Medical Center, Joplin*, 508 S.W.2d 7, 12 (Mo.App.1974); 88 C.J.S. *Trial* § 301(b) (1955). Plaintiffs chose to allege that Kaylo suffered from a design defect. Defendant's ultimate contention, however, is that there was insufficient evidence to show that Kaylo was "defective"; it asserts that there can be no product "defect," as plaintiffs claim, if it can be shown that under the state of the art during the time of manufacture defendant could not have known of the product's unreasonable danger. Thus, defendant's claim that the trial court erred in submitting the case by MAI 25.04 reflects its more fundamental assertion: that a state of the art defense should have been permitted by the trial court even under the design defect theory that plaintiffs pleaded, because there can be no defect without an indication that defendant knew or could have known that Kaylo could have been designed in a way that rendered it safer than it was.

This Court, in *Keener v. Dayton Electric Manufacturing Company*, 445 S.W.2d 362 (Mo.1969), adopted as the law of products liability in Missouri, Restatement (Second) of Torts § 402A:

"(1) One who sells any product in a defective condition unreasonably danger-

ous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

This rule was adopted for the reason, among others, " '... to insure that the costs of injuries resulting from defective products are borne by the manufacturers [and sellers] that put such products on the market rather than by the injured persons who are powerless to protect themselves.' *Greenman v. Yuba Power Products, Inc.,* 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897, 901, 13 A.L.R.2d 1049." *Keener, supra,* at 364..

This Court, in *Blevins v. Cushman Motors,* 551 S.W.2d 602 (Mo. banc 1977), then applied this concept of liability for injuries caused by a product unreasonably dangerous as manufactured to liability for injuries caused by a product unreasonably dangerous as designed because,

" '[T]here is no rational distinction between design and manufacture in this context, since a product may be equally defective and dangerous if its design subjects protected persons to unreasonable risks as if its manufacture does so.' *Pike v. Frank G. Hough Co.,* 2 Cal.3d 465, 85 Cal.Rptr. 629, 636, 467 P.2d 229, 236 (banc 1970)."

*Blevins, supra,* at 607.

▮ Although jurisdictions differ on admission of state of the art evidence in design defect cases, Robb, a Practical Approach to Use of State of the Art Evidence in Strict Products Liability Cases, 77 Nw.U. L.Rev. 1, 3–19 (1982), the law in Missouri holds that state of the art evidence has no bearing on the outcome of a strict liability claim; the sole subject of inquiry is the defective condition of the product and not the manufacturer's knowledge, negligence or fault. *Cryts v. Ford Motor Co.,* 571 S.W.2d 683 (Mo.App.1978). The manufacturer's standard of care is irrelevant because it relates to the reasonableness of the manufacturer's design choice; fault is an irrelevant consideration on the issue of liability in the strict liability context. Thus, plaintiffs established that Kaylo was "defective" when they proved that it was unreasonably dangerous as designed; they were not required to show additionally that the manufacturer or designer was "at fault," as that concept is employed in the negligence context. *See Ferren v. Richards Manufacturing Co.,* 733 F.2d 526 (8th Cir.1984); *Borel v. Fibreboard Paper Products Corp.,* 493 F.2d 1076 (5th Cir. 1973); *Aronson's Men's Stores, Inc. v. Potter Electric Signal Co., Inc.,* 632 S.W.2d 472 (Mo. banc 1982); *Blevins, supra; Cryts, supra.* The trial court properly denied the proffered state of the art argument, and there is no constitutional impediment to the retroactive application of *Keener v. Dayton Electric, supra. See Roth v. Roth,* 571 S.W.2d 659, 672 (Mo.App.1978).

Mr. and Mrs. Elmore assert that the order of the trial court which reduced Arthur's verdict for $117,250 to $17,250 and reduced Mary's verdict from $43,750 to $7,750 was erroneous.

The trial court determined, on the basis of affidavits from the members of the jury, that it was their intent to award $17,250 in addition to the $100,000 Mr. Elmore had received from the other defendants in settlement; they believed that the court would subtract the $100,000, and therefore they added the $100,000 to the amount that they intended to award to Arthur. Similarly in Mary's case they added $36,000 to the $7,750 that they intended to award to her against the defendant, with the intention

that the court would reduce the figure by that sum.

The jury was instructed to determine the total of each plaintiff's damages, and then to deduct from that amount the amount received by him or her in settlement, and to bring in the verdicts for the balance. When the original verdicts were returned, the jury was polled in open court and agreed to them. The trial court, nevertheless, granted defendant's motion to modify the verdicts and reduced the verdicts as described.

The defendant defends the action of the trial court in reducing the verdicts in accordance with its motion and in accordance with the affidavits of the members of the jury. Alternatively, the defendant appeals from the trial court's overruling its motion for a new trial based upon the jury's mistake in the amount of its verdict. Plaintiffs argue that the trial court directly impeached the jury's verdict, in violation of the holding in *Baumle v. Smith*, 420 S.W.2d 341, 348 (Mo.1967):

> No one is competent to impeach a verdict by the making of an affidavit as to matters inherent in the verdict, such as that the juror did not understand the law as contained in the court's instructions, or that he did not join in the verdict, or that he voted a certain way due to a misconception of the evidence, or misunderstood the statements of a witness, or was mistaken in his calculations, or other matters "resting alone in the juror's breast."

Each of the cases cited by defendant in support of its position involved a verdict which on its face, considered on the record, without the aid of the jurors' testimony, did not reflect the true pronouncement upon the case or was ambiguous. In none of the cases was there a direct impeachment of the verdict. *Federal Cold Storage Co. v. Pupillo*, 346 Mo. 136, 139 S.W.2d 996 (1940); *Keyes v. Chicago, B. & Q.R. Co.*, 326 Mo. 236, 31 S.W.2d 50 (1930); *Hays v. Hogan*, 273 Mo. 1, 200 S.W. 286 (1917). In this case, there is no ambiguity in the verdict and nothing in the record, aside from the affidavits, that casts any suspicion on these verdicts. The effect of the verdicts as originally returned will be to award Arthur and Mary Elmore $217,-250 and $79,750 respectively. The evidence suggests that such awards are not excessive, and the trial court should not have reduced them.

Accordingly, the judgment is reversed and the cause is remanded with directions to reinstate the verdicts of the jury and to enter judgment thereon for $117,250 for Arthur Elmore and for $43,750 for Mary Elmore. In all other respects, including defendant's liability, the judgment is affirmed.

RENDLEN, C.J., and GUNN, BILLINGS, and BLACKMAR, JJ., concur.

WELLIVER and DONNELLY, JJ., dissent in separate opinions filed.

WELLIVER, Justice, dissenting.

I respectfully dissent.

We transferred this case to determine whether the court of appeals had correctly followed our decisions in *Keener v. Dayton Electric Manufacturing Co.*, 445 S.W.2d 362 (Mo.1969), (a sump pump) and *Blevins v. Cushman Motors*, 551 S.W.2d 602 (Mo. banc 1977), (a three-wheel golf cart) both of which applied strict liability as set forth in § 402A of the Restatement (Second) of Torts. It now appears that the principal opinion would use this occasion to convert what was formerly strict liability into absolute liability.

The majority opinion arrives at this result by stating that "[i]t is a plaintiff's prerogative to choose the theory upon which he will submit his case," thereby permitting plaintiff to make the decision as to whether the facts constitute a manufacturer's defective design case or a case of an inherently dangerous product. The type of case the facts constitute is a matter of law to be determined by the court. A plaintiff cannot by his choice of a name, determine the law or instruction applicable to his case. If in a given case the question turns on what amount or percentage of

asbestos used in the end product will result in a danger or health hazard, then that case may well be a design defect case that should be submitted on MAI 24.04 (Strict Liability-Product Design). But such was not the case here. The only evidence in the case is that the manufacturer's end product, Kaylo, contained asbestos and that after a given point of time in history, the manufacturer either knew or should have known that asbestos was an "inherently dangerous" product thereby creating a duty to warn those who would use or handle the product. In this instance the proper submission is MAI 25.05 (Strict Liability-Failure To Warn).

There is no question that plaintiff can put on evidence to establish the point in time at which the manufacturer either knew or should have known that asbestos was inherently dangerous thereby creating the manufacturer's duty to warn. This is what an asbestos case is all about. This *is* state of the arts. If plaintiff can put on such evidence, I know of nothing in the law that precludes defendant from putting on contradictory evidence on the same question. To deny defendant the right to controvert this evidence is to make him an insuror. Submission of a case against any defendant and prohibiting such defendant from asserting his only available defense, cannot result in other than the imposition of absolute liability.

It is self-evident that under § 402A one does not have a legal obligation to warn until such time as he may reasonably be held to know of the "inherently dangerous defect" in the asbestos. *See* § 402A, comment (j). The only way to determine that issue is by admitting evidence (and hearing argument) on the question of the date on which the manufacturer received or should have received knowledge of the danger. Hearing evidence as to when doctors, scientists and engineers knew enough about the product to establish that it is inherently dangerous is the only way either the jury or the Court could know the point in time when the duty to warn attached to the manufacturer.

The principal opinion also is flawed in its misplaced reliance on *Borel v. Fibreboard Paper Products Corp.,* 493 F.2d 1076 (5th Cir.1973), *cert. denied,* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974); *Keener v. Dayton Electric Manufacturing Co., supra; Blevins v. Cushman Motors, supra.*

*Borel* was the first case to affirm a victory by an asbestos victim. The U.S. 5th Circuit Court of Appeals ruled that the asbestos industry had a duty to warn anyone who might come in contact with its products that asbestos posed a serious health hazard and that this danger had been foreseeable from and after a certain point in time which was established by the evidence. There was no way to recover from asbestosis prior to *Borel. Borel* was tried and submitted under a failure to warn theory and not under a defective design theory. Moreover, state of the art evidence was received and argued at length in that case. The principal opinion cites *Borel* as authority for its conclusion that "plaintiffs established that Kaylo was 'defective' when they proved that it was unreasonably dangerous as designed; they were not required to show additionally that the manufacturer or designer was 'at fault' as that concept is employed in the negligence context." Language from *Borel* is quite to the contrary:

Here, the plaintiff alleged that the defendants' product was unreasonably dangerous because of the failure to give adequate warnings of the known or knowable dangers involved. As explained in comment j to section 402a, a seller has a responsibility to inform users and consumers of dangers which the seller either knows or should know at the time the product is sold. The requirement that the danger be reasonably foreseeable, or scientifically discoverable, is an important limitation of the seller's liability. In general, "[t]he rule of strict liability subjects the seller to lability to the user or consumer even though he has exercised all possible care in the preparation and sale of the product." Section

402A, Comment a. *This is not the case where the product is alleged to be unreasonably dangerous because of a failure to give adequate warnings. Rather, a seller is under a duty to warn of only those dangers that are reasonably foreseeable.*

*Id.* at 1088. (Emphasis added, footnote omitted.) As I read *Borel*, it persuasively states the case for the position the principal opinion rejects. As for *Keener* and *Blevins,* the principal opinion attributes holdings which their author, Donnelly, J., also here dissenting, rejects as neither intended nor contemplated.

The principal opinion also is at odds with the prevailing views in other jurisdictions. With one notable exception, a state of the art defense has been permitted in all prior asbestos cases. *See, e.g., Jackson v. Johns-Manville Sales Corp.,* 727 F.2d 506 (5th Cir.1984); *Moran v. Johns-Manville Sales Corp.,* 691 F.2d 811 (6th Cir.1982); *Hardy v. Johns-Manville Sales Corp.,* 681 F.2d 334 (5th Cir.1982); *Karjala v. Johns-Manville Products Corp.,* 523 F.2d 155 (8th Cir.1975); *Borel v. Fibreboard Paper Products Corp., supra; Carter v. Johns-Manville Sales Corp.,* 557 F.Supp. 1317 (E.D.Tex.1983); *Neal v. Carey Canadian Mines, Ltd.,* 548 F.Supp. 357 (E.D.Penn. 1982); *In re Related Asbestos Cases,* 543 F.Supp. 1142 (N.D.Cal.1982). State of the art evidence was held inadmissible in *Beshada v. Johns-Manville Products Corp.,* 90 N.J. 191, 447 A.2d 539, 447 A.2d 539 (1982). Significantly the New Jersey Supreme Court retreated from the holding in *Beshada* the following year in *O'Brien v. Mushin Corp.,* 94 N.J. 169, 463 A.2d 298 (1983), when it held that state of the art evidence was admissible even in defective design cases.

The principal opinion is also unique in that, so far as I can determine, there has been no other instance among the multitude of asbestos cases where a case has been submitted on a defective design theory. All other cases involving asbestos-related injuries have been treated as failure

to warn cases. *See, e.g., Jackson v. Johns-Manville Sales Corp., supra; Moran v. Johns-Manville Sales Corp., supra; Hardy v. Johns-Manville Sales Corp., supra; Karjala v. Johns-Manville Products Corp., supra; Borel v. Fibreboard Paper Products Corp., supra; Neal v. Carey Canadian Mines, Ltd., supra; Johns-Manville/Asbestosis Cases,* 511 F.Supp. 1229 (N.D.Ill.1981); *Hammond v. North American Asbestos Corp.,* 97 Ill.2d 195, 73 Ill. Dec. 350, 454 N.E.2d 210 (1983); *Beshada v. Johns-Manville Products Corp., supra; Myles v. Johns-Manville Sales Corp.,* 9 Ohio App.3d 257, 459 N.E.2d 620 (1983); *Thiry v. Armstrong World Industries,* 661 P.2d 515 (Okla.1983); *Daniels v. Combustion Engineering, Inc.,* 583 S.W.2d 768 (Tenn.App.1978) (defective design and failure to warn alleged).

For there to be a lawsuit, there must be some issue to litigate. The bottom line is that the principal opinion takes away all defenses and leaves respondent without issue to either argue or litigate. Under the principal opinion, all that respondent is permitted to do is sit through the trial and await the jury announcement as to the amount of its liability as an insuror of the plaintiff.

State of the art *is* an issue in this case and the cause should be remanded for retrial of that issue. Rawls' principle of fairness[1] is the premise upon which comparative fault is based. That principle of fairness can and should be made a reality by permitting the jury on retrial to compare the fault of the parties as mandated by *Gustafson v. Benda,* 661 S.W.2d 11 (Mo. Banc.1983).

DONNELLY, Justice, dissenting.

In *Keener v. Dayton Electric Mfg. Co.,* 445 S.W.2d 362 (Mo.1969), this Court adopted Restatement (Second) of Torts § 402 A. It reads as follows:

> § 402 A. Special Liability of Seller of Product for Physical Harm to User or Consumer

---

1. *Parks v. Union Carbide Corp.* 602 S.W.2d 188, 193, n. 1 (Mo. banc 1980) (Welliver, J., dissenting); *Missouri Pac. R. Co. v. Whitehead & Kales Co.,* 566 S.W.2d 466, 469, n. 4 (Mo. banc 1978).

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Today, the majority forbids consideration of evidence which addresses the issue: Was the product unreasonably dangerous?

*In so doing*, the majority ignores concerns articulated by the Restatement:

i. *Unreasonably dangerous.* The rule stated in this Section applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer. Many products cannot possibly be made entirely safe for all consumption, and any food or drug necessarily involves some risk of harm, if only from over-consumption. Ordinary sugar is a deadly poison to diabetics, and castor oil found use under Mussolini as an instrument of torture. That is not what is meant by "unreasonably dangerous" in this Section. The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics. Good whiskey is not unreasonably dangerous merely because it will make some people drunk, and is especially dangerous to alcoholics; but bad whiskey, containing a dangerous amount of fusel oil, is unreasonably dangerous. Good tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful; but tobacco containing something like marijuana may be unreasonably dangerous. Good butter is not unreasonably dangerous merely because, if such be the case, it deposits cholesterol in the arteries and leads to heart attacks; but bad butter, contaminated with poisonous fish oil, is unreasonably dangerous.

j. *Directions or warning.* In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use. The seller may reasonably assume that those with common allergies, as for example to eggs or strawberries, will be aware of them, and he is not required to warn against them. Where, however, the product contains an ingredient to which a substantial number of the population are allergic, and the ingredient is one whose danger is not generally known, or if known is one which the consumer would reasonably not expect to find in the product, the seller is required to give warning against it, if he has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of the presence of the ingredient and the danger. Likewise in the case of poisonous drugs, or those unduly dangerous for other reasons, warning as to use may be required.

But a seller is not required to warn with respect to products, or ingredients in them, which are only dangerous, or potentially so, when consumed in excessive quantity, or over a long period of time, when the danger, or potentiality of danger, is generally known and recognized. Again the dangers of alcoholic beverages are an example, as are those of foods containing such substances as saturated fats, which may over a period of time have a deleterious effect upon the human heart.

Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous.

k. *Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning is not defective, nor is it *unreasonably dangerous.* The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

\*    \*    \*    \*    \*    \*

n. *Contributory negligence.* Since the liability with which this Section deals is not based upon negligence of the seller, but is strict liability, the rule applied to strict liability cases (see § 524) applies. Contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence. On the other hand the form of contributory negligence which consists in voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense under this Section as in other cases of strict liability. If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery.

*In so doing,* the majority amends § 402 A to read as follows:

§ 402 A. Special Liability of Seller of Product for Physical Harm to User or Consumer

(1) One who sells any product in a defective condition \* \* \* is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

    (a) the seller is engaged in the business of selling such a product, and

    (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

    (a) the seller has exercised all possible care in the preparation and sale of his product, and

    (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

In my view, today's amendment of § 402 A makes sellers insurers of their products and establishes compensation as only and always the goal in products liability cases in Missouri. This is unfortunate. To borrow from Richard A. Epstein: "If our only

**444**

goal is compensation, we should not handle product liability cases through the tort system. For a system of product liability law to be coherent, it must identify a set of policy constraints that combine to produce equilibrium. In other words, we need a theory powerful enough to explain not only those cases where recovery is appropriate, but also those cases where denial of recovery is appropriate. * * * [An] approach asking what distribution of risks would have been accepted had the point been negotiated originally offers far greater promise * * *." Epstein, Commentary, 58 N.Y. U.L.Rev. 930, 933 (1983). *See* J. Rawls, *A Theory of Justice* (Cambridge, Mass.: Harvard University Press, 1971) 11–16.

In my view, there is general acceptance of the concept that where persons contribute to cause an occurrence, and damage is suffered, each should bear responsibility only in proportion to his fault. This is the essence of pure comparative fault. I believe the concept belongs in the law of products liability. *See* Wade, *Products Liability and Plaintiff's Fault—The Uniform Comparative Fault Act*, 29 Mercer L.Rev. 373 (1978). I would reverse the judgment and remand the cause for a new trial based upon a determination of the comparative causal contributions of the parties to the injury. *See Gustafson v. Benda*, 661 S.W.2d 11 (Mo. banc 1983).

I respectfully dissent.