**D.L.C. and J.L.C., Appellants,**

v.

**Martha Irene WALSH, M.D., The Children's Mercy Hospital and Sheelagh Bull, Ph.D., Respondents.**

**No. WD 49982.**

Missouri Court of Appeals,
Western District.

Aug. 29, 1995.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 3, 1995.

Application to Transfer Denied
Nov. 21, 1995.

Elizabeth Diane Baker, Kansas City, for appellants.

Kirk J. Goza and Roger P. Wright, Shughart Thomson & Kilroy, Kansas City, for Sheelagh Bull, Ph.D.

Thomas W. Wagstaff, Sally B. Surridge, M. Courtney Koger, Blackwell Sanders Matheny Weary & Lombardi, Kansas City, for The Children's Mercy Hospital.

Jane McQueeny, Wm. Dirk Vandever, The Popham Law Firm, Kansas City, for Martha Irene Walsh.

Before FENNER, C.J., and
BRECKENRIDGE and HANNA, JJ.

BRECKENRIDGE, Judge.

Appellants, D.L.C. and J.L.C., appeal from an order by the trial court granting summary judgment in favor of Respondents, Martha Irene Walsh, M.D., Sheelagh Bull, Ph.D., and the Children's Mercy Hospital (the "Hospital"). Appellants claim that Dr. Walsh and Dr. Bull negligently misdiagnosed the existence of sexual abuse in J.L.C., and that the negligence of Dr. Walsh should be imputed to her employer, the Hospital. According to Appellants, Respondents should not be afforded statutory immunity for these acts. Appellants also claim that the Hospital did not promulgate adequate procedures regarding the diagnosis of sexual abuse, did not adequately train and supervise its personnel and did not provide suitable facilities.

Appellants raise five points on appeal, arguing the trial court erred in granting summary judgment to Respondents because (1) under a choice of law analysis it was improper to apply Kansas law, but even if Kansas law governs, health care providers do not enjoy immunity from professional negligence; (2)(A) Missouri law does not confer health care providers with immunity from the negligent diagnosis of child abuse; (2)(B) & (C) the Missouri Constitution guarantees Appellants the right of access to the courts and the right to trial by jury; (3) the trial court mistakenly found Appellants failed to state a valid claim; (4) Appellants were not collaterally estopped from asserting damages in this case; and (5) public policy dictates that health care providers should not be allowed to escape liability for negligent acts.

The trial court's order is affirmed.

█ This court considers the record in the light most favorable to the party against whom summary judgment was entered, and provides that party with all reasonable inferences which may be drawn from the evidence. *ITT Commercial Finance v. Mid–Am. Marine,* 854 S.W.2d 371, 376 (Mo. banc 1993). "Facts set forth by affidavit or otherwise in support of a party's motion are taken as true unless contradicted by the non-moving party's response to the summary judgment motion." *Id.*

D.L.C. ("Father") and J.L.C.'s mother ("Mother") were divorced in 1985 while residents of Kansas. Pursuant to the terms of the divorce decree, they shared joint physical custody of their daughter, J.L.C., who was born on August 3, 1983.

In early December, 1986, J.L.C. spent three nights with Father. After J.L.C. returned, Mother noticed that J.L.C. was walking bow-legged and was claiming her "bottom hurt." Mother contacted Dr. Bull, a psychologist who had previously counseled Mother and Father. Mother expressed her concern that J.L.C. had been sexually molested. Dr. Bull suggested Mother take J.L.C. to the emergency room of the Hospital for an exam-

ination. Mother followed Dr. Bull's advice and went there with J.L.C.

When they arrived, Dr. Walsh was on duty. Mother told Dr. Walsh she was worried that J.L.C. had been sexually abused by Father. After taking J.L.C.'s history, Dr. Walsh performed a general physical examination, which included an inspection of J.L.C.'s genitalia and her anal area. At the conclusion of the examination, Dr. Walsh was unable to make a firm diagnosis of sexual abuse. She did conclude, however, there was reason to suspect sexual assault.

Statutes in Missouri and Kansas mandate physicians to report cases of suspected child abuse to the proper authorities. § 210.135 RSMo 1986; K.S.A.1986 Supp. 38–1522a. The Missouri Division of Family Services ("MDFS") had previously advised Dr. Walsh that it had no jurisdiction over abusive incidents involving Kansas residents. MDFS told Dr. Walsh to report to the Kansas Department of Social and Rehabilitation Services ("KDRS") or to the local Kansas police department. Because Dr. Walsh knew that J.L.C. and her parents were residents of Kansas, she reported the suspected abuse to the Prairie Village, Kansas Police Department (the "Police") rather than to MDFS.[1] An investigation by KDRS and the Police followed.

On approximately December 8, 1986, Dr. Bull telephoned Detective Richard P. Wilcox, who was investigating the alleged sexual abuse for the Police. She began therapy sessions with J.L.C. the next day. On December 12, 1986, Detective Wilcox asked Dr. Bull to provide the Police with a written report of her sessions with J.L.C. Dr. Bull forwarded typed copies of her notes, as well as a videotape of a session with J.L.C. Dr. Bull continued to counsel J.L.C. until April 16, 1987.

On December 31, 1986, KDRS determined that the allegations of abuse were unfounded. It closed the case file and ended all investigation activities.

---

1. Pursuant to K.S.A. 38–1522a(c), reports are made to the "appropriate law enforcement agen-cy," when KDRS "is not open for business."

The week before, Mother had filed motions with the District Court of Johnson County, Kansas, requesting an order suspending visitation and for a change of custody. Dr. Walsh and Dr. Bull testified about the suspected abuse in a hearing on the motions. At the conclusion of the proceeding, the trial judge stated, "I don't feel it's necessary for me to make a judgment as to whether or not [J.L.C.] has been sexually abused. The evidence certainly is supportive of the conclusion that the allegations are far from frivolous." The judge then awarded sole custody to Mother, and limited Father to supervised visitation. Mother was granted permission to move to Pennsylvania with J.L.C.

Father filed a medical malpractice suit, individually and as next friend for J.L.C., against Respondents.[2] The court dismissed the petition, determining that § 210.135, RSMo 1986,[3] provided Dr. Walsh and the Hospital with immunity. On appeal, this court reversed the judgment and remanded the case, holding that the immunity of § 210.135 applies only to those who make reports to MDFS. *Comstock v. Walsh,* 848 S.W.2d 7, 9 (Mo.App.1992). Because Dr. Walsh reported the suspected child abuse to the Kansas Police rather than to MDFS, the immunity of § 210.135 was not available. *Id.*

On remand, the trial court granted Respondents' motions for summary judgment. The court gave several reasons for the dismissal, including that Kansas's reporting statute provided Respondents with immunity. This appeal followed.

## I. *Choice of Law*

■ Appellants' first point contends the trial court erred in granting summary judgment to Respondents, because a choice of law analysis mandates the selection of Missouri law.

2. The trial court later removed Father as next friend and appointed a Guardian ad Litem to represent J.L.C.

3. § 210.135, RSMo 1986, reads, in pertinent part:
   Any person ... complying with the provisions of sections 210.110 to 210.165 in the making of a report ... shall have immunity from any

"A fundamental principle of conflicts is that a forum state will always apply forum procedure, but it will choose the applicable substantive law according to its own conflicts of law doctrines." *Ernst v. Ford Motor Co.,* 813 S.W.2d 910, 921 (Mo.App.1991). Beginning with *Kennedy v. Dixon,* 439 S.W.2d 173, 184 (Mo. banc 1969), Missouri has followed § 145 of the Restatement (Second) on Conflict of Laws to determine which state's substantive law to apply in a tort case. Section 145 reads:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

   (a) the place where the injury occurred,

   (b) the place where the conduct causing the injury occurred,

   (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

   (d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Section 145 is framed in reference to § 6 of the Restatement (Second) on Conflict of Laws. *Griggs v. Riley,* 489 S.W.2d 469, 473 (Mo.App.1972). Section 6 provides:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

   liability, civil or criminal, that otherwise might result by reason of such actions. Provided, however, any person intentionally filing a false report shall not have immunity, from any liability, civil or criminal. Any such person ... shall have the same immunity with respect to participation in any judicial proceeding resulting from the report.

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Although this court will apply both § 6 and § 145, "[t]he basic principles governing choice of laws are those enumerated in § 6. Section 145 simply provides that certain contacts may be taken into account in determining the choice of law *under the principles of § 6.*" *Griggs,* 489 S.W.2d at 473. This court therefore begins its analysis by addressing the concerns listed in § 6(2).[4]

### § 6(2)(b) The Relevant Policies of the Forum

Missouri's reporting statute, § 210.135, provides immunity to complying health care providers and is designed to encourage the reporting of suspected child abuse. *Voepel v. Cardinal Glennon Memorial Hospital,* 743 S.W.2d 600, 601 (Mo.App.1988). Thus, the relevant policy of Missouri is to grant immunity to those who report and investigate suspected child abuse.

Health care providers will be more likely to investigate and report incidents of suspected child molestation if they can be assured of protection under the laws of the state in which they are required to report. Because Dr. Walsh reported to Kansas officials, as instructed by MDFS, she and the Hospital were precluded immunity under Missouri law. *Comstock,* 848 S.W.2d at 9. Missouri's policy favors granting immunity to health care providers and since Kansas law must apply to provide Dr. Walsh and the Hospital with immunity, Missouri's policy favors the application of Kansas law.

### § 6(2)(c) The Relevant Policies of Other Interested States

The relevant policy of Kansas is "to provide for the protection of children who have been abused by encouraging the reporting of suspected child abuse and by insuring the thorough and prompt investigation of such reports." *Kansas State Bank v. Specialized Tr. Serv.,* 249 Kan. 348, 819 P.2d 587, 604 (1991). *See also* K.S.A.1982 Supp. 38–1521. As discussed above, the incentive of Missouri health care workers near the state line to report would be chilled if those individuals knew they would not be immune from civil liability whenever they reported incidents involving Kansas residents to Kansas authorities. This would contravene Kansas's policy of encouraging the reporting of suspected child abuse. The policy of Kansas suggests its own law should apply.

### § 6(2)(d) The Protection of Justified Expectations

The justified expectations of health care workers can be protected only through the application of Kansas law. Because all fifty states have reporting statutes that grant immunity, *Elmore v. Van Horn,* 844 P.2d 1078, 1082 (Wyo.1992), health care workers expect to be free from liability arising from the reporting and investigation of suspected child abuse. It would generally be "unfair and improper to hold a person liable under the local law of one state when he had justifiably molded his conduct to conform to the requirements of another state." Comment (g) to § 6 of the Restatement (Second) of Conflict of Laws. Dr. Walsh conformed her conduct to the reporting requirements of Kansas, because MDFS had told her it had no jurisdiction over abuse cases involving Kansas residents. Therefore, the expectations of Respondents weigh in favor of applying Kansas law.

Since Missouri and Kansas have nearly identical statutes granting immunity, D.L.C. and J.L.C. should have expected the same treatment no matter which state's law applied. Accordingly, Appellants' expectations

---

4. Because § 6(2)(a) is not relevant, it will not be addressed.

do not weigh in favor of choosing either Missouri or Kansas law.

### § 6(2)(e) The Basic Policies Underlying the Particular Field of Law

According to comment (h) to § 6, Restatement (Second) on Conflict of Laws:

> This factor is of particular importance in situations where the policies of the interested states are largely the same but where there are nevertheless minor differences between their relevant local law rules. In such instances, there is good reason for the court to apply the local law of that state which will best achieve the basic policy, or policies, underlying the particular field of law involved.

The policies of Kansas and Missouri are quite similar in that both provide a basic scheme of immunity to those who report and investigate suspected child molestation. Each state requires reports to be made to the state's own governmental authorities. § 210.135 RSMo 1986; K.S.A.1984 Supp. 38–1526. Because the differences between the two statutes are not relevant here, this factor does not provide guidance.

### § 6(2)(f) Certainty, Predictability and Uniformity of Result

Health care workers should be able to predict whether they will be immune from liability arising from the report and investigation of suspected child abuse. Certainty, predictability and uniformity of result are best achieved by applying the law of the state in which a report of suspected abuse was properly made.

### § 6(2)(g) Ease in the Determination and Application of the Law

Both Missouri and Kansas have similar reporting statutes. *See* § 210.135; K.S.A. 38–1526. The differences between the two are not significant in this case. Therefore, this factor does not weigh in favor of applying either law.

### § 145: Most Significant Relationship Test

As mentioned earlier, § 6 is considered in light of the four factors listed in § 145. The first factor is the place where the injury occurred. Appellants' petition alleged J.L.C. suffered the following damages:

(a) She has been caused to believe that she is sexually abused when, in fact, this is not true;

(b) She was required to under [sic] additional counseling and counseling [sic], the exact nature and extent of which is unknown at this time;

(c) She has suffered reasonable and necessary expenses and hospital care, therapy and counseling, the exact amount of which is unknown at this time;

(d) She will in the future suffer reasonable and necessary expenses for medical and hospital care, counseling and therapy, the exact amount of which is unknown at this time;

(e) She has suffered and will in the future suffer from extreme mental anguish and mental suffering;

(f) She has suffered loss of enjoyment of life;

(g) She has been deprived of the companionship and company of her father;

(h) She has been deprived of the parenting of her father;

(i) All of her injuries are painful and progressive, all to her damage.

In addition, it alleged Father sustained the following damages:

(a) He has lost the companionship and company of his daughter;

(b) He has suffered reasonable and necessary medical expenses for medical and psychological care and will int he [sic] future suffer reasonable and necessary expenses for medical and psychological care of both himself and his daughter, the exact amount of which is unknown at this time;

(c) He has suffered loss of services of his said daughter and will in the future suffer loss of services of his said daughter, Plaintiff [J.L.C.];

(d) He has been deprived of being a parent to his daughter, Plaintiff [J.L.C.];

(e) His relationship with his child has been impaired;

(f) He has suffered financial losses, including the loss of his home, the exact amount of which is unknown at this time;

(g) He has suffered loss of enjoyment of life;

(h) All of his injuries are serious, permanent, painful and progressive, all to his damage.

The custody proceeding and exercise of visitation took place in Kansas. Therefore, it was in Kansas that Father allegedly lost the companionship, company and services of J.L.C., where he was deprived of being a parent, where his relationship with J.L.C. was impaired, and where he presumably lost his enjoyment of life. Likewise, J.L.C. suffered many of her alleged damages in Kansas, because the custody proceeding there gave Mother sole custody of J.L.C.

Appellants claim that because the medical and psychological examinations performed by Dr. Walsh and Dr. Bull occurred in Missouri, Appellants' injuries arose there. Yet, in their Suggestions in Opposition to Dr. Walsh's Motion for Summary Judgment, Appellants state: "All of the catastrophic damages to [Appellants] and to the parent-child relationship claimed in [the] Petition took place after the mandatory reporting activity had taken place and the report was deemed unfounded." Appellants therefore concede, and this court agrees, that their damages did not arise in Missouri, because Dr. Walsh's examination of J.L.C., as well as many of Dr. Bull's counseling sessions with J.L.C., occurred before the allegations of abuse were found by the KDRS to be groundless. The alleged damages occurred at or following the Kansas custody proceeding. Therefore, the primary place of injury is Kansas.

The second factor under § 145 is the place where the conduct causing the injury occurred. Dr. Walsh and Dr. Bull examined and counseled J.L.C. in Missouri. Accordingly, the allegedly negligent conduct took place in Missouri.

Courts next consider the domicil, residence, nationality, place of incorporation and place of business of the parties. J.L.C. and her parents were residents of Kansas at all times relevant to this suit. However, the Hospital was a Missouri non-profit corporation, and Dr. Walsh and Dr. Bull provided professional care in Missouri. Because the residencies and business locales are split, this factor does not provide guidance.

Finally, courts weigh the place where the relationship between the parties is centered. Here, the relationship is based in Missouri, because Respondents provided the relevant health care there.

After applying the elements of § 6 and § 145, it is necessary to evaluate those factors to determine which state has the most significant relationship to the parties and occurrences. *Kennedy*, 439 S.W.2d at 184. Several factors favor application of Kansas law. Both Missouri and Kansas have policies encouraging the reporting and investigation of suspected child abuse. These policies would be fostered by applying Kansas law. In addition, the parties' justified expectations and the predictability of result weigh in favor of choosing Kansas law, due to the anticipation of immunity by those who properly report suspected child abuse.

Two factors weigh in favor of applying Missouri law. First, Missouri is where the conduct causing the injury occurred. Nevertheless, the place of injury, Kansas, controls over the place of the alleged harmful conduct. *Galvin v. McGilley Memorial Chapels*, 746 S.W.2d 588, 590–91 (Mo.App.1987). Second, the relationship between the parties is centered in Missouri. However, this factor alone does not preclude application of Kansas law.

The important policy reasons listed above compel the finding that Kansas has the most significant relationship with the parties and the occurrences. Accordingly, Kansas law should be applied.

## II. *Kansas Statutory Immunity for Negligent Misdiagnosis of Suspected Child Abuse*

In applying Kansas law, the trial court relied upon K.S.A. 38–1526 to provide Respondents immunity, which reads:

Anyone participating without malice in the making of an oral or written report to a law enforcement agency or the department of social and rehabilitation services relating to injury inflicted upon a child under 18 years of age as a result of physical, mental or emotional abuse or neglect or sexual abuse or in any follow-up activity to or investigation of the report shall have immunity from any civil liability that might otherwise be incurred or imposed. Any such participant shall have the same immunity with respect to participation in any judicial proceedings resulting from the report.

Appellants do not dispute the propriety of Dr. Walsh making the report of suspected sexual abuse. Nor do Appellants challenge the testimony of Dr. Walsh and Dr. Bull at the custody hearing. Rather, Appellants claim the issue is whether Respondents are liable for alleged errors in professional judgment which occurred during the relevant medical and psychological evaluations.

Kansas courts have yet to decide whether K.S.A. 38–1526 provides immunity for the negligent misdiagnosis of suspected child abuse. This court therefore endeavors to interpret the scope of immunity provided by that statute. For simplicity, the statute will be applied to each Respondent separately.

### Dr. Walsh's Immunity

■ Where a statute is plain and unambiguous, the intent of the legislature is given effect as expressed, and the courts do not determine what the law should or should not be. *Martindale v. Robert T. Tenny, M.D.*, 250 Kan. 621, 829 P.2d 561, 565 (1992). Courts construe words in common usage according to the natural and ordinary meaning of those words. *House v. American Family Mut. Ins. Co.*, 251 Kan. 419, 837 P.2d 391, 394 (1992). Under Kansas law, "[i]t is a fundamental rule of statutory construction to which all other rules are subordinate that the intent of the legislature governs when that intent can be ascertained." *Martindale*, 829 P.2d at 565.

■ Appellants claim the intent of the legislature to deny immunity is readily ascertainable from a plain reading of the statute. They argue that Kansas's reporting statute enumerates specific activities for which immunity is conferred—namely the making of an oral or written report, any follow-up activity to or investigation of a report, and participation in any judicial proceeding—but that the statute does not mention medical or professional negligence. Appellants contend if the Kansas legislature had meant to provide qualified immunity to health care workers for acts of professional negligence, it would have explicitly done so.

Appellants' argument is without merit. K.S.A. 38–1526 provides immunity for anyone "participating" in the "making" of a report. Thus, the plain language of the statute covers not only the report of suspected child abuse, but also the "making" of such a report. Certainly, part of the process of making a report is an examination of the child. Without the examination, no report would exist. The two are inextricably linked. The Kansas legislature recognized this by providing immunity not only for the communication of suspected child abuse, but also for the "making" or development of such communication.

The legislature has clearly demonstrated an intent to protect children who have been physically abused. K.S.A. 38–1521 states, in pertinent part:

> It is the policy of [Kansas] to provide for the protection of children who have been subject to physical, mental or emotional abuse or neglect or sexual abuse by encouraging the reporting of suspected child abuse and neglect, insuring the thorough and prompt investigation of these reports and providing preventive and rehabilitative services when appropriate to abused or neglected children and their families so that, if possible, the families can remain together without further threat to the children.

*See also Kansas State Bank*, 819 P.2d at 604. The goal of encouraging the reporting of suspected child abuse is better met when those attempting to comply with the statute are confident that no civil liability will result therefrom.

Appellants argue that because their damages flow not from the report of suspected child abuse, but from the examination itself, statutory immunity should not apply. Appellants assert an analogous situation is a doctor who negligently sets the broken leg of a child who has been physically abused. Immunity should not be provided the doctor, contend Appellants, simply because the injured party was a victim of child abuse. Appellants concede the act of reporting the suspected child abuse should be immune from liability, but contend the doctor's malpractice in setting the leg should not be protected.

Appellants' argument is unavailing. Imposing liability on the doctor who improperly sets the broken leg of a child abuse victim would not chill the reporting of such abuse. The actions taken by the doctor in forming the diagnosis of suspected child abuse are clearly separate and distinct from those performed in treating the broken leg. Here, Dr. Walsh's examination of J.L.C. was part of her reporting activities.

Furthermore, K.S.A. 38–1522a(f) states that the "[w]illful and knowing failure to make a report required by [the reporting statute] is a class B misdemeanor." If immunity did not apply to the negligent misdiagnosis of child abuse, health care providers would face a dilemma. By reporting suspected abuse, they would open themselves up to malpractice actions, but by declining to make a report, they could be guilty of a misdemeanor. This result cannot be what the Kansas legislature intended. "[T]he legislature is presumed to intend that a statute be given a reasonable construction, so as to avoid unreasonable or absurd results." *Todd v. Kelly*, 251 Kan. 512, 837 P.2d 381, 387 (1992).

Courts from other jurisdictions with similar reporting statutes have also held that statutory immunity applies not only to the report of suspected child abuse, but to the underlying diagnosis itself. *See Watterson v. Page*, 987 F.2d 1, 10 (1st Cir.1993); *Michaels v. Gordon*, 211 Ga.App. 470, 439 S.E.2d 722, 724 (1993); *Maples v. Siddiqui*, 450 N.W.2d 529, 530 (Iowa 1990); *Awkerman v. Tri-County Orthopedic Group, P.C.*, 143 Mich. App. 722, 373 N.W.2d 204, 206 (1985); *May*

*v. S.E. Wyoming Mental Health Ctr.*, 866 P.2d 732, 738 (Wyo.1993). In *Awkerman*, 373 N.W.2d at 207, the Michigan appellate court noted that if plaintiffs could sue for malpractice, "the immunity granted to a physician who files a child abuse report would be entirely emasculated since a litigant could always assert that an incorrect diagnosis of child abuse constituted malpractice."

An initial investigation of suspected abuse is so inextricably linked to the resulting report that it would be illogical to deny immunity for it. To hold otherwise would discourage individuals from reporting suspected child abuse. Accordingly, Dr. Walsh is entitled to immunity under Kansas law.

### The Hospital's Immunity

■ This court next turns to Appellants' claim against the Hospital. Appellants contend the negligent acts of Dr. Walsh are imputed to the Hospital, because Dr. Walsh was its agent, servant and employee. In addition, Appellants contend the Hospital failed to promulgate adequate policies regarding the diagnosis of sexual abuse, failed to adequately supervise its staff, and failed to adequately train its personnel and provide suitable facilities to diagnose or exclude sexual abuse.

K.S.A. 38–1526 does not explicitly provide immunity for employers of those who negligently misdiagnose suspected child abuse. Kansas courts have not addressed the issue. Therefore, this court must look to the intention of the Kansas legislature in enacting K.S.A. 38–1526 to determine whether the Hospital is immune from liability. *Martindale*, 829 P.2d at 565.

The intention of the legislature, as noted above, was to foster the prompt reporting and investigation of suspected child abuse. *See* K.S.A. 38–1521. This policy would be defeated if employers did not enjoy the same immunity as their employees. Just as health care providers would be discouraged from reporting suspected child abuse if their underlying diagnosis of suspected abuse was not afforded immunity, there would also be a chilling effect if health care providers knew

their employers would face liability for such reports.

Case law from other jurisdictions supports this conclusion. In *Montoya by Montoya v. Bebensee*, 761 P.2d 285 (Colo.App.1988), a psychologist was sued for the alleged negligence and outrageous conduct of his employee, an unlicensed associate, and for negligently supervising the employee. The associate had counseled a child, reported that abuse had occurred and advised the mother to restrict the father's right to visitation. Later, the dissolution court determined the associate's findings were unfounded and fully restored the father's visitation rights. In determining whether the psychologist had a right to immunity under Colorado's reporting statute, the Colorado appellate court stated:

> [The psychologist's] actions in negligently supervising [his employee], as alleged by father, do not fall within the literal terms of [the reporting statute], and therefore, it could be argued that he may not take advantage of the immunity granted by that statute. Yet, to impose liability upon the employer of a mental health care provider who negligently, but in good faith, makes a report of child abuse to county officials would, in our opinion, violate the public policy inherent in that statute and would inhibit the reporting that that statute is designed to encourage. Thus, we conclude that the immunity granted by [the reporting statute] to the person actually making any report must also be extended to that person's employer.

*Id.* at 290.

Likewise, in *Storch v. Silverman*, 186 Cal. App.3d 671, 681–82, 231 Cal.Rptr. 27, 33 (1986), the appellate court of California held that because the liability of the hospital, under the doctrine of respondeat superior, was necessarily based on its employee's negligent report of child abuse, the state's immunity statute defeated any action against the hospital.

Because Dr. Walsh is entitled to immunity under Kansas's reporting statute, her alleged negligence cannot be imputed to the Hospital. Although Appellants attempt to separate their claim against the Hospital by alleging that it negligently supervised and trained

its employees, provided inadequate facilities, and promulgated inadequate protocols for the diagnosis of child abuse, those claims are inseparably linked to Dr. Walsh's diagnosis. Accordingly, the Hospital is entitled to immunity for claims arising from Dr. Walsh's report of suspected child abuse.

### Dr. Bull's Immunity

■ Finally, this court addresses Appellants' malpractice claim against Dr. Bull. Unlike Dr. Walsh, Dr. Bull's sessions with J.L.C. occurred after the report of suspected child abuse was made.

K.S.A. 38–1526 provides immunity to those who participate in "any follow-up activity to or investigation of the report" of suspected child abuse. By providing written notes and a videotape of a counseling session to the Police, Dr. Bull was participating in the investigation of suspected child abuse. K.S.A. 38–1526. For the same reasons discussed above, Dr. Bull's conveyance of information to the Police cannot be separated from the sessions with J.L.C. which produced that information. Therefore, under the purview of Kansas's reporting statute, Dr. Bull is immune from all claims of negligence relating to the investigation of or follow-up activity to the report of suspected abuse.

Dr. Bull continued to counsel J.L.C. for approximately four and a half months after the report of suspected child abuse was determined to be unfounded. Therefore, it is questionable whether all of Dr. Bull's professional acts were taken in the "follow-up" to or "investigation" of the report. However, Appellants do not include in their "points relied on" a claim that the trial court erred by granting summary judgment in that there was a disputed question of fact as to whether Dr. Bull committed malpractice after the "follow-up" to or "investigation" of the report was completed. Any matter not raised in a "point relied on" is considered abandoned and is no longer an issue on appeal. *Humphrey v. Sisk*, 890 S.W.2d 18, 21 (Mo.App. 1994). Appellants' first point is denied.

Appellants' fifth point is rebutted in that Appellants claim public policy reasons dictate that health care providers not be allowed to

escape liability for their negligent acts. This court has already discussed how the contention is without merit. The policy of Kansas is to encourage the reporting and investigation of suspected child abuse by providing immunity to those who participate in such activities.

"Summary judgment is designed to permit the trial court to enter judgment, without delay, where the moving party has demonstrated, on the basis of facts as to which there is no genuine dispute, a right to judgment as a matter of law." *ITT*, 854 S.W.2d at 376; Rule 74.04, Missouri Rules of Civil Procedure (1995). In this court's resolution of Appellants' first point, it is determined that Kansas law governs and that the affirmative defense of immunity entitles Respondents to summary judgment as a matter of law. Therefore, Appellants' remaining points will not be addressed. The order of the trial court granting summary judgment to Respondents is affirmed.

All concur.