Judy NATALINI, Joseph L. Natalini, Jr.,
Brian L. Natalini, Stephen L. Natali-
ni, Mark L. Natalini, and Brenda Na-
talini Robinson, as Heirs of Joseph
Natalini, Deceased, Plaintiffs–Appel-
lants,

v.

Blake A. LITTLE, M.D., Defendant–
Respondent.

No. 26958.

Missouri Court of Appeals,
Southern District,
Division One.

Feb. 28, 2006.

Fred J. Spigarelli and Thomas E. Hayes, The Spigarelli Law Firm, Pittsburg, KS, for appellants.

Charles H. Stitt and Gregory P. Forney, of Shaffer, Lombardo, Shurin, Kansas City, MO, for respondent.

GARY W. LYNCH, Judge.

Plaintiffs filed a petition seeking damages against the Defendant for the wrongful death of their decedent due to Defendant's alleged medical malpractice. Defendant raised, among other things, the affirmative defense that the Kansas statute of limitation, the application of which is required by the Missouri borrowing statute, barred Plaintiffs' claim. The trial court sustained Defendant's motion for summary judgment and entered judgment accordingly. Plaintiffs appeal this judgment, and we affirm.

### 1) *Standard of Review*

"Summary judgment is designed to permit the trial court to enter judgment, without delay, where the moving party has demonstrated, on the basis of facts as to which there is no genuine dispute, a right to judgment as a matter of law. Rule 74.04."[1] *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). "Summary judgment proceeds from an analytical predicate that, where the facts are not in dispute, a prevailing party can be determined as a matter of law." *Id.*

Appellate review of the grant of summary judgment is *de novo. Id.* "The criteria on appeal for testing the propriety of summary judgment are no different from those which should be employed by the trial court to determine the propriety of sustaining the motion initially." *Id.* "The propriety of summary judgment is purely an issue of law. As the trial court's judgment is founded on the record submitted and the law, an appellate court need not defer to the trial court's order granting summary judgment." *Id.*

A "Defending Party," as that term is used in Rule 74.04(b), may establish a right to summary judgment by showing "that there is no genuine dispute as to the existence of *each* of the facts necessary to support the movant's properly-pleaded affirmative defense." *Id.* at 381.

### 2) *Undisputed Facts*

Dr. Blake A. Little ("Defendant") resides in Jasper County, Missouri. His

---

1. All references to statutes are to RSMo (2000) and all references to rules are to Missouri Court Rules (2005), unless otherwise indicated.

medical office, which is located in Joplin, Missouri, handles paper work, scheduling appointments, follow-up letters and phone calls to patients. During the relevant time periods of this case, Defendant made bi-weekly trips to Fort Scott, Kansas to provide pulmonary services to Fort Scott and Pittsburg area residents.

A pulmonary function test was performed on Joseph Natalini ("Natalini") on June 13, 1995 in Fort Scott, Kansas, at Mercy Hospital. Before the end of that month, Defendant authored a consultation report, which subsequently was mailed to Natalini's treating physician, Dr. Douglas Weddle ("Dr. Weddle"), in Fort Scott, Kansas.

Defendant treated Natalini in 1996 for lung lesions. In March of that year, Natalini underwent a CT scan at Mercy Hospital in Fort Scott, Kansas. The CT scan contrast revealed two small noncalcified pulmonary nodules in Natalini's right lung. Defendant saw Natalini at his office in Joplin, Missouri in April of 1996. That same month, Defendant wrote a letter from his office regarding following Natalini's lung lesions by CT scan monitoring. The following month, at Defendant's request, Natalini underwent a CT scan, which was performed in Fort Scott, Kansas. The CT scan revealed two small nodules in the right upper lung, as indicated by Natalini's radiology report dated May 15, 1996 from Mercy Hospital, Fort Scott, Kansas. The following November 15, 1996, a CT scan was performed.

Defendant saw Natalini at Mount Carmel Hospital in Pittsburg, Kansas on December 2, 1996 regarding recent changes as shown in his CT scan performed on November 15, 1996. At this visit, Defendant advised Natalini that he noticed a new nodule and ordered a CT scan to be performed in two months. A little less than three weeks later, Natalini tele-phoned Defendant at Defendant's Joplin, Missouri office and advised Defendant that he refused to have another CT scan. As a result of this refusal, Defendant, while in his Joplin, Missouri office, changed the order for a CT scan to a plain chest x-ray film. Changing the CT scan order to a plain chest x-ray was below the standard of care. Defendant failed to properly follow up with Natalini following the November 1996 CT scan. This failure to follow up was below the standard of care.

On February 17, 1997, a chest x-ray was performed on Natalini, pursuant to Defendant's order, at Mercy Hospital in Fort Scott, Kansas. An x-ray report was faxed to Defendant's office in Joplin, Missouri. Defendant failed to look at this x-ray report until July 1998. This failure to review the report was below the standard of care.

In July of 1998, Defendant saw Natalini at his office in Joplin, Missouri, at which time he hospitalized Natalini for lung biopsy, which revealed the first diagnosis of lung cancer. Natalini's cancer was diagnosed in August of 1998 at St. John's Regional Medical Center in Joplin, Missouri.

Before his death, Natalini filed, prosecuted, and obtained a final judgment in a personal injury action for medical malpractice against Defendant. *Natalini v. Little*, 278 Kan. 140, 92 P.3d 567 (Kan.2004). This case was filed in Kansas against Defendant and Dr. Weddle. Dr. Weddle only saw Natalini as a patient in Kansas; thus, jurisdiction over Dr. Weddle could only be obtained in Kansas. Natalini filed a motion to apply Missouri law in this case, based upon the argument that Defendant's negligence allegedly occurred in Missouri. The Kansas trial court overruled this motion.

Natalini died on April 12, 2004, in the state of Kansas. Appellants, his wife and five adult children ("Plaintiffs"), survived him. Plaintiffs filed this wrongful death action against Defendant on July 13, 2004, in the Circuit Court of Jasper County, Missouri.

At all times relevant to the issues raised in this action, Natalini and his wife resided in Pittsburg, Kansas. Natalini's adult children and heirs are Kansas residents. In this wrongful death action, Plaintiffs allege the same negligent acts and omissions by Defendant and the same physical consequences to Natalini as was alleged by Natalini in his personal injury action against the Defendant.

Plaintiffs filed a Motion for Partial Summary Judgment on Liability, and Defendant filed a Motion for Summary Judgment. Defendant urged upon the trial court three grounds in support of his Motion for Summary Judgment, any one of which would support the trial court's grant of summary judgment in Defendant's favor. Those grounds were:

- Missouri's borrowing statute (§ 516.190) requires application of the Kansas statute of limitation which time-bars Plaintiff's wrongful death action;
- Kansas substantive law applies to this wrongful death action, and such law precludes a wrongful-death action based upon the same alleged negligent acts which were the basis for the decedent's personal injury judgment; and,
- If Kansas substantive law does not apply and Missouri law applies, it also precludes a wrongful death action based upon the same allegedly negligent acts which were the basis for the preceding personal injury judgment.

The trial court sustained Defendant's Motion for Summary Judgment and entered judgment dismissing Plaintiffs' petition. Plaintiffs appeal this judgment.

### 3) *Application of § 516.190—Missouri's Borrowing Statute*

■ Section 516.190, commonly referred to as the "borrowing statute," provides: "Whenever a cause of action has been fully barred by the laws of the state, territory or country in which it originated, said bar shall be a complete defense to any action thereon, brought in any of the courts of this state." In this statute, the legislature has provided a choice-of-law rule to determine the applicable statute of limitation for a cause of action based upon where it "originates." *Thompson by Thompson v. Crawford*, 833 S.W.2d 868, 872 (Mo. banc 1992).

■ For the purpose of determining where a cause of action "originates," courts look to when a cause of action "accrues," as set forth in § 516.100 and have equated "originated" with "accrued," as used in that statute. *Id.* at 871. *See also Renfroe v. Eli Lilly & Co.*, 686 F.2d 642, 647 n. 9 (8th Cir.1982). Section 516.100 describes "accrued" as: "the cause of action shall not be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment[.]" So, for the purpose of applying § 516.190, a "cause of action shall not be deemed to" originate where "the wrong is done or the technical breach of contract or duty occurs, but," where "the damage resulting therefrom is sustained and capable of ascertainment." "A cause of action accrues when and originates where damages are sustained and are capable of ascertainment." *Day v. DeVries & Assocs., P.C.*, 98 S.W.3d 92, 95–96 (Mo. App.2003), quoting *Elmore v. Owens–Illinois, Inc.*, 673 S.W.2d 434, 436 (Mo. banc 1984). Therefore, determination of the lo-

cation where a cause of action originates involves a two-step process: first, the identification of the "damage resulting therefrom"; and, second, locating where the damage so identified was sustained and became capable of ascertainment.

### a) *Resulting Damages*

The word "therefrom," as used in § 516.100, refers to "the wrong ... done or the technical breach of ... duty" in the immediately-preceding clause of that statute. More clearly then, the first step requires identifying the damage resulting from the wrong done or the technical breach of duty.

### i) *Wrong Done or Technical Breach of Duty*

The Plaintiffs do not claim that Defendant's conduct caused Natalini's cancer, but rather, that Defendant's wrongful conduct resulted in Natalini's cancer becoming incurable. According to the undisputed facts and as alleged in Plaintiff's Second Amended Petition, Defendant's wrongs commenced no earlier than February 17, 1997, when he failed to properly follow up with Natalini after his November 15, 1996 CT scan by substituting a plain chest x-ray for a follow-up CT scan. Thereafter, Plaintiffs claim, Natalini's cancer continued to go undetected because: Defendant failed to follow up with Natalini after receiving the February 17, 1997 chest x-ray report; Defendant failed to order a follow-up CT scan after the February 17, 1997 plain chest x-ray; Defendant failed to re-view the February 17, 1997 chest x-ray report that was sent to his office until July 1998; and, Defendant failed to timely and correctly recognize and treat Natalini's cancer as evidenced by his symptoms, including radiographic evidence of nodular changes on lung CT scans.

Plaintiffs further claim that at some time after February 17, 1997, but before July of 1998, when Natalini's biopsy showed incurable cancer, Defendant should have diagnosed Natalini's cancer and that at that time, whenever it was during that time period, Natalini's cancer would have been curable. Therefore, Plaintiffs conclude that Defendant's wrongs, as set out above, caused Natalini's death.

Now that the "wrongs" have been identified, we must move to a determination as to the "damages" resulting from such wrongs. Plaintiffs urge that we look to Natalini's damages, and Defendant urges that we look to Plaintiffs' damages.[2] Both looks are toward Kansas.

### ii) *Natalini's Damages*

Plaintiffs claim Natalini was damaged as a result of Defendant's wrongful delay in diagnosing Natalini's cancer, in that Natalini's cancer moved from a curable stage after February 17, 1997 to become incurable sometime before July of 1998.

### iii) *Plaintiffs' Damages*

Plaintiffs' Second Amended Petition describes Plaintiffs' damages in five differing

**2.** In support of their argument, Plaintiffs cite *Elmore*, 673 S.W.2d at 434, claiming that "[t]he holding in *Elmore* equally applies to wrongful death cases." However, Plaintiffs fail to cite any support for this claim and we find none. *Elmore's* holding was directed toward determining where a plaintiff's damages in a *personal injury* action originated for the purpose of the application of the borrowing statute. In the context of a wrongful death action, as in the present case, it seems clear that the relevant inquiry concerns the location where the damages of Plaintiffs originated, as urged by Defendant, and not where the damages of the decedent originated, as claimed by Plaintiffs. Our research does not disclose any case where this precise issue has been addressed or decided. We do not reach or decide this issue because under our analysis of the facts of this particular case, both the decedent's damages and Plaintiffs' damages originated in Kansas.

paragraphs. Paragraph 18 claims that Plaintiffs "sustained damage as a result of [Natalini's] premature death[.]" Paragraph 26 states that "Plaintiffs are not claiming any damages on behalf of [Natalini] for injuries and damages he sustained from the date of negligence to the date of his death." Paragraph 27 asserts that "Plaintiffs are claiming damages for their respective losses as a result of the death of a husband and father." Paragraph 28 alleges that the negligence of the Defendant caused "Plaintiffs to suffer the loss of services, consortium, companionship, comfort, instruction, guidance, counsel, training and support by reason of the death. Plaintiffs additionally suffered pecuniary losses in the form of loss of income and support, and medical and funeral expenses." Paragraph 29 further claims "[t]hat as a direct and proximate result of Defendant's negligence, [Natalini] died ... which resulted in losses to his heirs in the form of pecuniary loss for the burial, lost earnings, services, comfort, love, counsel, training, society and support which they would have received had [Natalini] not died." No other allegations of damage are made by the Plaintiffs.

Obliviously, Plaintiffs are claiming that, as a result of Defendant's wrongs, they are damaged by the death of Natalini.

**b)** *Location Where Damages Sustained and Capable of Ascertainment*

Considering Natalini's damages first, the earliest date, as indicated by the undisputed facts, that Defendant would have detected Natalini's cancer was February 17, 1997, if he had obtained a CT scan on that date as he had originally ordered. It is foundational to Plaintiffs' action that on this date Natalini's cancer was curable. The latest date Defendant could have diagnosed Natalini's cancer was in July of 1998 when Defendant ordered a biopsy and his cancer was thereafter, in fact, first diagnosed. These dates frame the time period within which Natalini's cancer became incurable. During this entire time period, Natalini was a resident of Kansas and was located in Kansas. There are no facts supporting any conclusion other than that Natalini's cancer became incurable where he was residing and physically located, which was in Kansas.

A similar issue presented itself in *Renfroe, supra.*

In *Renfroe,* the plaintiffs sued to recover for damages suffered *in utero* in Missouri from exposure to a drug manufactured by defendants. The plaintiffs developed cancer many years later after moving to other states. The Eighth Circuit held that their cause of action became capable of ascertainment only when the plaintiffs developed cancer. *Id.* at 647. Therefore, their cause of action originated in the state in which they lived when they developed cancer. *Id.*

*Harris–Laboy v. Blessing Hosp., Inc.,* 972 S.W.2d 522, 525 (Mo.App.1998).

If the location of damage for causing cancer is the state of residence of the cancer victim, it follows that the location of the damage for causing curable cancer to become incurable is also the state of residence, which in this case is Kansas.

Plaintiffs also cite *Elmore,* 673 S.W.2d at 434, for the proposition that even though the plaintiff was a Kansas resident the court still found that his claim for wrongful exposure to asbestos "originated" in Missouri to defeat the application of the borrowing statute (§ 516.190). *Elmore* involved a personal injury action in which the plaintiff claimed that his asbestosis was caused by exposure to asbestos manufactured by the defendant. The facts in *Elmore* differ significantly from the facts in the instant case. Although Elmore was

a resident of Kansas, he was employed primarily in Missouri, and most of his exposure to asbestos, *i.e.*, his injury, occurred while so employed. *Id.* at 437. His asbestosis was diagnosed in Missouri but not until several years after this exposure. *Id.* at 436. "It was not until such diagnosis was made that the character of the condition (asbestosis) and its cause (breathing asbestos dust) first 'came together' for the plaintiff." *Id.*

In the instant case, Natalini has no corresponding "exposure" in Missouri. His cancer originated in Kansas, and the movement of such cancer from being curable to incurable (the injury attributed by Plaintiffs to Defendant) also occurred in Kansas. *See Brown v. Westinghouse Elec. Corp.*, 803 S.W.2d 610, 613 (Mo.App.1990).

Next, considering Plaintiffs' damages, it is undisputed that Natalini's death occurred in Kansas. Therefore, the location where Plaintiffs sustained damage was in Kansas.

■ Plaintiffs claim that "[t]he fact that Joseph Natalini died in Kansas is not relevant to where this case originated. The Court must look at the place where the malpractice occurred that caused the death. In this case, that place is Missouri. Consequently, 516.190 ... does not apply." First, the only authority Plaintiffs cite for this proposition is *Dzur M.D. v. Gaertner*, 657 S.W.2d 35 (Mo.App.1983). This case has no application to the borrowing statute, and Plaintiffs' reliance upon it is misplaced. *Dzur* dealt with the proper *venue* of a wrongful death action and when a wrongful death action "accrues" for the purpose of establishing proper *venue*. It does not address where a cause of action "originates" for the purpose of the borrowing statute.

■ Plaintiffs cite no authority that any court has ever used or even considered using venue cases to determine the applicability of the borrowing statute. "Venue statutes and borrowing statutes ... serve different policies." *Patch v. Playboy Enter., Inc.*, 652 F.2d 754, 757 (8th Cir.1981). "The purpose of statutorily specified venue is to protect the defendant against the risk that a plaintiff will select an unfair or inconvenient place of trial." *Id.* "The purpose of a borrowing statute is primarily to prevent a plaintiff from forum shopping for a statute of limitations. The statute prevents a plaintiff from gaining more time to bring an action merely by suing in a forum other than where the cause of action accrued." *Id.* at 756.

This court can come to no conclusion other than that the damages from Defendant's wrongs, whether to Natalini or to Plaintiffs, were sustained and became capable of ascertainment in the state of Kansas, and, therefore, originated in Kansas. Based upon this conclusion, the provisions of the borrowing statute, § 516.190, require that we borrow the law of Kansas for the applicable statute of limitations, unless there is some other law that negates the application of the borrowing statute. *Brown*, 803 S.W.2d at 613.

### 4) *Section 516.300 and The Application of the Borrowing Statute*

■ Plaintiffs contend that the application of the Missouri borrowing statute is precluded by § 516.300, citing *Malone by Alexander v. Jackson*, 652 S.W.2d 170 (Mo. App.1983). However, the actual import of that case has been subsequently explained by the Missouri Supreme Court in the context of circumstances essentially identical to those in the present case. *Thompson*, 833 S.W.2d at 868. The statute in question in both *Malone* and *Thompson*, § 516.300, states that the Missouri statutes of limitations (including § 516.190) do not apply to "any action which is or shall be

otherwise limited by any statute." § 516.300. As the Missouri Supreme Court explained, this quoted language refers to a cause of action, such as a wrongful death action, "in which the limitation is inherent within the statute." *Thompson,* 833 S.W.2d at 871. As the court went on to explain:

> Section 516.300 is designed to assure the Missouri general statute of limitations will not be injected into a cause of action that has its own built-in statute of limitations. The creation of the cause of action with a built-in statute of limitations essentially makes it impossible to use the cause of action without using the limitation period because no cause of action exists beyond the expiration of the statute of limitations.

*Id.*

In *Thompson,* the Missouri Supreme Court held that § 516.300 did not apply (and therefore did not preclude the application of the Missouri borrowing statute) in the context of a death claim to which Tennessee provided the substantive law generally applicable to that claim. *Id.* In doing so, the court distinguished *Malone,* in which § 516.300 was held to apply. As the court explained, the situation in *Malone* was similar to the situation in *Thompson,* in that, in each case, the action had been filed in Missouri, whereas the accident and resulting death had occurred in Tennessee. *Id.* However, in *Malone,* the substantive law generally applicable to the death claim was the law of Missouri, rather than the law of the Tennessee. *Id.* Since the Missouri wrongful death statute

contains a built-in statute of limitations, any action based on that statute is one that is "otherwise limited," as that term is used in § 516.300. *Id.* at 872. Consequently, § 516.300 precluded the application of the Missouri borrowing statute to the action considered in *Malone.* In contrast, the substantive law generally governing the death claim involved in *Thompson* was Tennessee law, which does not have a built-in statute of limitations. *Id.* In the context of such an action, "section 516.300 does not exempt the cause of action from the purview of section 516.190." *Id.*

Therefore, in order to determine the applicability of § 516.300 in this case, we must determine whether the substantive law of Missouri or the substantive law of Kansas applies to this wrongful death claim and, if the latter, whether the Kansas wrongful death statute has a built-in statute of limitations.

a) *The Substantive Law of Kansas Applies*

The determination of the applicable substantive law is guided by the RESTATEMENT (SECOND) OF CONFLICT OF LAWS 2d (1979) ("the RESTATEMENT"). *Kennedy v. Dixon,* 439 S.W.2d 173, 184 (Mo. banc 1969). In *Kennedy,* a personal injury action, the Supreme Court said, "We have concluded that we should abandon the inflexible *lex loci delicti* rule in favor of the rule set forth in § 145 of the Proposed Official Draft of Restatement (Second) on Conflict of Laws." *Id.* Section 145 of the RESTATEMENT states the general principle pertaining to tort actions, such as in *Kennedy.*[3]

3. RESTATEMENT (SECOND) OF CONFLICT OF LAWS 2d (1979) § 145 provides, in part:

Chapter 7—Wrongs
  Topic 1—Torts
    Title A—The General Principle
§ 145  The General Principle
  (1) The rights and liabilities of the parties with respect to an issue in tort are determined

by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
  (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
    (a) the place where the injury occurred,

Section 175 of the RESTATEMENT pertains to wrongful death actions, such as in *Thompson*.[4] However, the court in *Thompson*, without explanation other than citing *Kennedy*, chose to use § 145 for its analysis of which state's wrongful death substantive law should apply.[5] For this reason, we will do an analysis under both sections.[6]

### i) *Application of § 175 of the RESTATEMENT*

Section 175 of the RESTATEMENT calls for the application of the substantive laws of the, "state where the injury occurred," unless, "with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties[.]" Comment b to § 175 states that the "place where the injury occurs" is considered to be "the place where the force set in motion by the actor *first takes effect on the person.*" (Emphasis added).

Plaintiffs claim that Natalini's cancer advanced, as a result of defendant's negligence, during the entire period from February 17, 1997 through July of 1998. *See* discussion under Point 3)b) above. There is no dispute in this case that, during the *first* portion of this period (in fact, during the *entire* period, up to its last moment), Natalini was located in Kansas. As a result, the "force" set in motion by defendant **first** "took effect" on Natalini in the State of Kansas, and Kansas was the "state where the injury occurred," as that term is used in § 175 of the RESTATEMENT. Under that section, Kansas is therefore the state whose law is to be applied, unless, with respect to some particular issue, i.e., the applicable statute of limitations, another state has a more significant relationship to both the occurrence and the parties.

Plaintiffs contend that Missouri has a more significant relationship than Kansas, in that the conduct (or as Plaintiff alleges, in part, the omissions) of Defendant occurred in Missouri. Plaintiffs' assumption that all of Defendant's wrongful conduct occurred in Missouri is not supported by the facts. During the entire period from February 17, 1997 through July of 1998, the Defendant was making bi-weekly trips to Kansas to see patients, in addition to maintaining his office in Missouri. There-

---

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

4. RESTATEMENT (SECOND) OF CONFLICT OF LAWS 2d (1979) § 175 provides, in part:

Chapter 7—Wrongs
  Topic 2—Actions for Death
§ 175  Right of Action for Death
In an action for wrongful death, the local law of the state where the injury occurred determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

*See also* comment c to this section which provides, in part: *"Scope of section.* The rule of this Section applies to all actions to recover for a death that is claimed to have been tortiously caused."

5. The applicability of § 175 to wrongful death actions was noted briefly by this court in *Rotella v. Joseph,* 615 S.W.2d 616, 624 (Mo. App.1981). *See also Goede v. Aerojet Gen. Corp.,* 143 S.W.3d 14, 25 n. 8 (Mo.App.2004) (citing applicability of § 175 to wrongful death actions).

6. Comment a of § 175 of the RESTATEMENT provides: *"Rationale.* Under the rule of this Section, the law applicable to wrongful death is selected by the same principles as control selection of the law applicable to personal injuries in general (see § 146)."

fore, some of Defendant's wrongful conduct occurred in Missouri and some occurred in Kansas. Assuming for purposes of considering this point in the light most favorable to Plaintiffs, but without making such a determination, that the a greater amount of Defendant's wrongful conduct occurred in Missouri than in Kansas, we would be presented with a situation at best from the Plaintiffs' point of view where the conduct and the injury occurred in different states. Comment f of § 175 of the RESTATEMENT addresses this situation as follows:

> When conduct and injury occur in different states. On occasion, conduct and injury will occur in different states. In such instances, the local law of the state of injury will usually be applied to determine most issues involving the tort (see § 145, Comments d-e and §§ 156–166 and 172).

> The local law of the state where the injury occurred is most likely to be applied when the decedent had a settled relationship to that state, either because he was domiciled or resided there or because he did business there. When, however, the decedent was domiciled or resided or did business in the state where the conduct occurred, this state is more likely to be the state of most significant relationship and therefore the state of the applicable law with respect to issues that would usually be determined by the local law of the state of injury. The same may be true when the injury occurred in the course of an activity or of a relationship which was centered in the state where the conduct occurred and when the decedent had no settled relationship to the state where the injury occurred.

> The state where the conduct occurred is even more likely to be the state of most significant relationship when these two elements are combined, that is to say, when, in addition to the decedent's having been domiciled or having resided or having done business in the state, the injury occurred in the course of an activity or of a relationship which was centered there. One example is where the injury occurred in the course of an employment centered in the state where the conduct took place and where the decedent was domiciled.

This comment indicates that the law of the state of injury (Kansas, in this case) will be applied when the decedent had a "settled relationship" to that state unless the decedent had either or both a settled relationship with the state of conduct (Missouri) or the injury occurred in the course of an activity or of a relationship which was "centered" in the state of conduct (Missouri).

Natalini had a settled relationship with Kansas—the state of injury. He was located, resided and domiciled in Kansas. Virtually all of his medical treatment related to this matter occurred in Kansas. His primary treating physician, Dr. Weddle, was located in Kansas. At the time Dr. Weddle referred him to Defendant, the Defendant was making bi-weekly trips to Fort Scott to provide pulmonary services to Fort Scott and Pittsburg, Kansas area residents.

Natalini did not have a settled relationship with Missouri—the state of conduct. According to the undisputed facts, Natalini only had two occasions to be in Missouri related to his treatment by the Defendant. Both were office visits occurring in April of 1996 and then again in July of 1998. The last visit was well after Defendant's claimed wrongful conduct occurred and well after Natalini had been first injured as a result of Defendant's conduct.

These facts also demonstrate that Natalini was not injured in the course of an

activity or of a relationship that was "centered" in Missouri—the state of conduct. He was only in Missouri on one occasion before the claimed wrongful conduct occurred and before he was first injured. Other than this one office visit in April of 1996, the Plaintiffs are hard-pressed to show that Natalini had any activity or relationship with Missouri, much less that it was "centered" in Missouri. As detailed in 4)a)ii) below, the relationship between Natalini and Defendant was "centered" in Kansas.

Applying § 175 of the RESTATEMENT, we conclude that the relevant contacts—the injury occurring in Kansas, Natalini's settled relationship with Kansas, and the fact that the relationship between Natalini and Defendant was not centered in Missouri, but rather, in Kansas—all support the application of Kansas substantive law, unless Missouri, "has a more significant relationship under the principles stated in § 6 to the occurrence and the parties[.]" For that analysis, *see* Point 4)a)iii) below.

### ii) *Application of § 145 of the RESTATEMENT*

The, "most significant relationship to the occurrence and the parties" analysis under § 145 of the RESTATEMENT involves consideration of the four types of contact listed in Subsection (2). They are listed and discussed as follows:

### (1) *The place where the injury occurred.*

As previously discussed, the injury to Natalini occurred in Kansas, and his death occurred in Kansas. The injuries that Plaintiffs claim as damages due to Natalini's death, as listed in their petition and as detailed in Point 3)a)iii) above, have all occurred or will occur in Kansas, due to the fact that Natalini and all the Plaintiffs were and are Kansas residents.

### (2) *The place where the conduct causing the injury occurred.*

The Defendant's conduct on December 19, 1996, in changing the order for a CT scan to a plain chest x-ray on February 17, 1997, occurred in Missouri. All other claimed wrongful conduct by the Defendant were acts of omission—Defendant's failure to properly follow up with Natalini following the November 1996 CT scan; to review the x-ray report of February 17, 1997; to follow up with decedent after February 17, 1997; and to take affirmative action thereafter until July of 1998. These omissions occurred during a period of time in which the Defendant practiced medicine in his office in Missouri and, on a bi-weekly basis, in Kansas. Therefore, the conduct causing the injury occurred in both Missouri and in Kansas.

### (3) *The domicile, residence, nationality, place of incorporation and place of business of the parties.*

During all relevant time periods, Natalini resided in Kansas, all of the Plaintiffs resided in Kansas, and Defendant resided in Missouri, had a medical office in Missouri, and practiced medicine in both Missouri and Kansas.

### (4) *The place where the relationship, if any, between the parties is centered.*

The relationship between Natalini and Defendant was centered in Kansas. His Kansas treating physician, Dr. Weddle, referred Natalini to Defendant. This referral was for Natalini to see the Defendant in Kansas. Defendant traveled bi-weekly to Kansas to see patients. Natalini's office visits with Defendant occurred in Kansas, except for two isolated instances in April of 1996 and in July of 1998. Natalini obtained virtually all of his medical treatment on this matter in Kansas. Natalini's second visit to see Defendant in Missouri was in July 1998, which was after the

Defendant's claimed wrongful conduct occurred and was also after Natalini had been injured.

There is no evidence to suggest or support any relationship between Plaintiffs and the Defendant.

### iii) *Consideration of Factors in § 6(2) of the RESTATEMENT*

Our inquiry, however, cannot end with just the consideration of the type and number of contacts identified in §§ 175 and 145 in Chapter 7 (Wrongs) of the RESTATEMENT.[7] "[I]t is not the number of contacts which determines the choice of law but which state—when those contacts are considered in the perspective of Restatement (Second) § 6 choice of law principles—has the most significant relationship to the occurrence and parties, and so is entitled to have its law determine the particular issue." *Nelson v. Hall*, 684 S.W.2d 350, 360 (Mo.App.1984). Section 6(2) of the RESTATEMENT lists seven factors relevant to choice of the applicable law.[8] We will address each factor and discuss them in the order listed.

### (1) *Needs of the interstate and international systems*

Because this factor is not relevant, it will not be addressed and will not be considered in the determination of the applicable law in this case.

### (2) *Relevant policies of the forum*

Missouri has a policy interest in protecting its residents from an out-of-state plaintiff shopping for a forum within which to assert a claim accruing in plaintiff's state of residence that is otherwise barred by

---

7. Comment c to § 6(2) of the RESTATEMENT provides, in part:

Those chapters in the Restatement of this Subject which are concerned with choice of law state the rules which the courts have evolved in accommodation of the factors listed in this Subsection. In certain areas, as in parts of Property (Chapter 9), such rules are sufficiently precise to permit them to be applied in the decision of a case without explicit reference to the factors which underlie them. In other areas, *such as in Wrongs (Chapter 7)* and Contracts (Chapter 8), the difficulties and complexities involved have as yet prevented the courts from formulating a precise rule, or series of rules, which provide a satisfactory accommodation of the underlying factors in all of the situations which may arise. All that can presently be done in these areas is to state a general principle, such as application of the local law "of the state of most significant relationship," which provides some clue to the correct approach but does not furnish precise answers. In these areas, the courts must look in each case to the underlying factors themselves in order to arrive at a decision which will best accommodate them. (Emphasis added).

"Section 145 is framed in reference to § 6 of the Restatement (Second) on Conflict of Laws." *D.L.C. v. Walsh*, 908 S.W.2d 791, 794

(Mo.App.1995) *quoting Griggs v. Riley*, 489 S.W.2d 469, 473 (Mo.App.1972). "Section 145 simply provides that certain contacts may be taken into account in determining the choice of law under the principles of § 6." 908 S.W.2d at 795.

8. Section 6 of the RESTATEMENT provides, in part:

§ 6. Choice-Of-Law Principles

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

the laws of that state.[9] *Patch*, 652 F.2d at 756. In this case, the Plaintiffs are residents of Kansas, Natalini was a resident of Kansas, Natalini was injured in Kansas, Plaintiffs were injured in Kansas by Natalini's wrongful death, and Plaintiffs' wrongful death action is barred by the Kansas statute of limitations and by claim preclusion due to Natalini's prior personal injury judgment.[10] Defendant is a resident of Missouri, his relationship with Natalini was centered in Kansas and he has no relationship with the out-of-state Plaintiffs. This state's policy of protecting its residents from forum-shopping plaintiffs can best be served by applying Kansas law in this case.

Plaintiffs assert that Missouri also has a policy interest in seeking "to hold citizens responsible for acts committed in the state." Plaintiffs cite no authority for this proposition. If Plaintiffs are referring to the policy interest of providing compensation to a victim from a party whose conduct has injured them, then this policy would be applicable not only in Missouri, but also in Kansas.[11] In this case, the best Plaintiffs can argue is that the majority of Defendant's wrongful conduct occurred in Missouri. This fact would support this policy and the application of Missouri law.

**(3) *Relevant policies of other interested states and the relative interests of those states in the determination of the particular issue***

As noted in the discussion of the preceding factor, Kansas has a policy interest in providing compensation to a victim from a party whose conduct has injured them.[12] In this case, the Kansas policy interest would carry greater weight than Missouri's corresponding interest because the injury occurred in Kansas and arose from a relationship centered in Kansas; the first injured person, Natalini, was a resident of Kansas; the Plaintiffs are Kansas residents; all of Plaintiffs' damages occurred in Kansas; and part of Defendant's wrongful conduct, during the period of his acts of omission, occurred in Kansas. Plaintiffs have failed to offer any explanation or authority as to why Missouri would have a greater interest and concern than Kansas for the protection of Kansas residents who were injured in Kansas as a result of wrongful conduct that occurred, in part, in Kansas arising out of a relationship that was centered in Kansas. *See Nelson v. Hall*, 684 S.W.2d 350, 360 (Mo. App.1984). This policy and these facts significantly favor the application of Kansas law in this case.

---

9. Defendant claims that Kansas law bars Plaintiffs' action by the application of its statute of limitations and, also, by claim preclusion due to Natalini's prior personal injury judgment.

10. *See* Point 5) below for the statute of limitations bar, and *see Mason v. Gerin Corp.*, 231 Kan. 718, 647 P.2d 1340, 1343–44 (1982), and *Natalini*, 92 P.3d at 569–70, for the claim preclusion bar.

11. "We can discern three basic objectives behind the statute: to provide compensation to bereaved plaintiffs for their loss, to ensure that tortfeasors pay for the consequences of their actions, and generally to deter harmful

conduct which might lead to death." *O'Grady v. Brown*, 654 S.W.2d 904, 909 (Mo. banc 1983).

12. "K.S.A. 60–1901 explains the general purpose of wrongful death actions in Kansas:

> If the death of a person is caused by the wrongful act or omission of another, an action may be maintained for the damages resulting therefrom if the former might have maintained the action had he or she lived, in accordance with the provisions of this article, against the wrongdoer, or his or her personal representative if he or she is deceased.

*Parker v. Mid–Century Ins. Co.*, 25 Kan.App.2d 329, 331, 962 P.2d 1114 (Kan.Ct.App.1998).

(4) *Protection of justified expectations*

Comment g to § 6(2) of the RESTATE-MENT states, in part:

There are occasions, particularly in the area of negligence, when the parties act without giving thought to the legal consequences of their conduct or to the law that may be applied. In such situations, the parties have no justified expectations to protect, and this factor can play no part in the decision of a choice-of-law question.

There are no facts in this case that indicate that Natalini, Defendant or Plaintiffs ever gave any thought to the "legal consequences of their conduct or to the law that may be applied." For this reason, this factor need not be considered in the determination of the applicable law.

(5) *Basic policies underlying the particular field of law*

In this case, the court is unable to ascertain any basic policies underlying any particular field of law that would assist in the determination of the applicable law.

Plaintiffs contend: "The basic policy underlying wrongful death or tort law is that a wrongdoer should be held responsible for the injuries caused to another by substandard conduct. Here, the conduct occurred in Missouri, as did the diagnosis of incurable cancer." However, we have already determined that Plaintiffs' conclusion that the wrongful conduct all occurred in Missouri is incorrect. Wrongful conduct occurred in Missouri and in Kansas and, therefore, the application of this policy would be equally applicable in each state.

As to Plaintiff's second argument concerning the location of the diagnosis of incurable cancer, Plaintiffs have failed to demonstrate how this fact, which occurred after any of Defendant's wrongful conduct terminated and Natalini's resulting injury, is relevant to advance any policy of Missouri over a policy of Kansas. Put another way, the location of the diagnosis does not assist in determining the location of the injury, the location of the wrongful conduct or any other relevant contacts identified in §§ 175 and 145 of the RESTATEMENT. Therefore, it has no relevance to the policies considered under the principles listed in this § 6(2) of the RESTATEMENT as applied to those contacts.

(6) *Certainty, predictability and uniformity of result*

Comment i of § 6(2) of the RESTATEMENT provides that certainty, predictability and uniformity of result "are important values in all areas of the law" and, "[t]o the extent that they are attained in choice of law, forum shopping will be discouraged." This principle coincides with the basic policy underlying Missouri's Borrowing Statute (§ 516.090). *Patch*, 652 F.2d at 756, and *see* discussion in point 4)a)iii)(2) above. Plaintiffs have failed to identify any coherent argument that the application of Missouri law in this case would in any way support Missouri's policy against forum shopping.

Applying the law of the state where the injury occurred to a wrongful death action supports this principle. RESTATEMENT (SECOND) OF CONFLICT OF LAWS 2d (1979) § 175 cmt. d. Both of the above factors indicate that this principle as applied to the facts supports the application of the Kansas substantive law in this case.

(7) *Ease in the determination and application of the law to be applied*

Plaintiffs contend that this principle supports the application of Missouri substantive law in this case, "because the Court is most familiar with Missouri law." This argument is misguided. Comment j of § 6(2) of the RESTATEMENT illuminates the purpose of this principle: "Ideally, choice-

of-law rules should be simple and easy to apply." The familiarity of this court to the relevant law of the forum or the other state has no bearing upon whether any particular choice of law rule is, "simple and easy to apply." [13]

Comment d to § 175 of the RESTATEMENT indicates that "[Section 175] furthers the choice-of-law [value] ..., since the state where the injury occurred will usually be readily ascertainable, of ease in the determination and application of the applicable law." In this case it is "readily ascertainable" that Natalini's injuries and Plaintiffs' injuries all occurred in Kansas. Therefore, the application of this principle to the facts would support the use of Kansas substantive law in this case.

#### iv) *Conclusion as to Applicable Substantive Law*

Based upon the types and character of the contacts identified in §§ 175 and 145 of the RESTATEMENT and the consideration of those contacts as applied to the principles set forth in § 6(2) of the RESTATEMENT, as discussed above, we conclude that the state with the most significant contacts is Kansas and that Kansas substantive law applies in this case.[14]

#### b) *No Built-in Statute of Limitations in the Kansas Wrongful Death Statute*

■ This Court has recognized that Kansas no longer has a "built-in" limitation

in its wrongful-death act. *McDonald v. Ward,* 919 S.W.2d 251, 252–53 (Mo.App. 1996). Consequently, the application of the Missouri borrowing statute (§ 516.190), which operates to "borrow" the Kansas statute of limitations discussed above, is not precluded by the terms of § 516.300. *Thompson,* 833 S.W.2d at 871.

#### 5) *Application of the Kansas Statute of Limitations*

■ The applicable Kansas statute of limitations provides that a cause of action "arising out of the rendering or the failure to render professional services by a health care provider" may not, in any event, be commenced "more than four years beyond the time of the act giving rise to the cause of action." K.S.A. 60–513(c). This language applies to both wrongful death actions and personal injury actions, so long as they arise out of the rendering of or the failure to render professional services by a health care provider. *Brubaker v. Cavanaugh,* 741 F.2d 318, 319–20 (10th Cir. 1984); *see also Lewis v. BHS College Meadows,* 2004 WL 870818, *1, *2–3 (U.S.Dist.Ct., D.Kan.2004).

The present action was filed on July 13, 2004. This was well over four years after any possible negligent act by defendant could have occurred. The only affirmative act of negligence alleged by plaintiffs occurred on December 19, 1996 (the order

---

**13.** Comment j to § 6(2) also provides, in part: "This policy should not be overemphasized, since it is obviously of greater importance that choice-of-law rules lead to desirable results." Our Supreme Court addressed this issue in *Kennedy* when it abrogated the easy and simple, but "inflexible" *lex loci delicti* rule and adopted § 145 of the RESTATEMENT (SECOND) OF CONFLICTS OF LAWS. 439 S.W.2d 173 at 184.

**14.** "In general, it is fitting that the state whose interests are most deeply affected should have its local law applied." RESTATE-

MENT (SECOND) OF CONFLICTS OF LAWS 2d (1979) § 6 cmt. f.

"The likelihood that some state other than that where the injury occurred is the state of most significant relationship is greater in those relatively rare situations where, with respect to the particular issue, the state of injury bears little relation to the occurrence and the parties." RESTATEMENT (SECOND) OF CONFLICTS OF LAWS 2d (1979) § 175 cmt. d. For an example of the latter case, *see State ex rel. Kansas City Stock Yards Co. of Maine v.Clark,* 536 S.W.2d 142 (Mo. banc 1976).

substituting a plain chest x-ray for a previously-ordered CT scan). Any negligence on the part of defendant in failing to diagnose Natalini's cancer ceased by July, 1998, when defendant ordered the diagnostic testing that led to the actual diagnosis of Natalini's lung cancer. Furthermore, no negligence in failing to diagnose Natalini's lung cancer could have possibly occurred after August of 1998, when that cancer was actually diagnosed. Consequently, the last "act giving rise to the cause of action" occurred, at the very latest, in August of 1998. The applicable Kansas statute of limitations, therefore, required that the present action be filed by August of 2002. Since it was not, this action is barred under the Kansas statute of limitations, and is therefore barred under the Missouri borrowing statute, § 516.190.[15]

This consequence of this application of Kansas law was confirmed by the Kansas Supreme Court under the specific facts of this case. *Natalini,* 92 P.3d at 567. The court rejected Natalini's right to bring a "wrongful death" action, during his lifetime, on behalf of his potential heirs. In the context of that appeal, Natalini requested the court to allow such a recovery, in order to obviate what Natalini claimed would be the "otherwise harsh effect" that would obtain, in the event Natalini were to survive more than four years after the last act of negligence by defendant. *Id.* at 569. Specifically, Natalini claimed that this "harsh effect" would result from the inter-

play between (a) the Kansas statute of limitations for medical malpractice actions (which would preclude an action by Natalini, if not brought within four years of the last act of negligence), and (b) the Kansas wrongful-death act (under which a wrongful death action could not be brought, if the decedent was not entitled to bring a personal injury action, at the time of his death). The Kansas Supreme Court commented that neither of the relevant statutes was "unclear or ambiguous," and that:

> [P]laintiff's survival for more than 4 years beyond the negligent act means no wrongful death action will ever be possible. [K.S.A. 60–513(c), the medical malpractice statute of limitations] and K.S.A. 60–1901 [the wrongful-death act] will combine to cut it off before it can accrue, *i.e.,* before the death giving rise to the action has occurred. Although family members of the patient would qualify at the time of death as heirs at law entitled to seek recovery in a wrongful death suit [citation omitted], they would be prevented from bringing an action because 60–513(c)'s repose language would have barred the injured patient's own lawsuit before his or her death.

*Id.*

Plaintiffs have not contended or argued in this appeal that the conclusions stated in *Natalini* by the Kansas Supreme Court are incorrect characterizations of Kansas law.[16]

---

15. "Generally speaking, there will be no recovery for wrongful death after the expiration of the time fixed for bringing the action in the wrongful death statute of the state of the applicable law." RESTATEMENT (SECOND) OF CONFLICTS OF LAWS 2d (1979) § 175 cmt. g.

16. The Kansas Supreme Court went on to state in *Natalini* at page 569:

> Natalini's counsel urges us to fashion a way around the combined effect of 60–

513(c) and 60–1901 here. He raises the specter of cancer patients foregoing treatment to ensure they will die in time to allow their families to bring a wrongful death suit. He asserts that advances in medical science have enabled us to maximize the length of such patients' lives and that the law has not kept pace with these advances.

> Even if we agree, it is not this court's role to rewrite statutes but to interpret them. Natalini does not seek interpretation; he

**6) *Decision***

Based upon our holding that the Plaintiffs' wrongful death action against Defendant is barred by the Kansas statute of limitation through the application of Missouri's borrowing statute, the entry of summary judgment by the trial court in favor of the Defendant was appropriate. Because the determination of this issue affirms the judgment of the trial court, we need not, and will not, address any other basis of support for the trial court's entry of summary judgment or Plaintiffs' claimed errors thereof.

The judgment of the trial court is affirmed.

RAHMEYER, P.J., and PARRISH, J., concur.

seeks wholesale revision. We cannot oblige. The legislature is the branch of our state government endowed with the exclusive power to amend statutes, and it is to the legislature to whom arguments about the dilemma faced by families such as Natalini's should be addressed.

Our decision in this case is consistent with this statement. Any inequities perceived by Kansas residents about Kansas statutory law as applied to injuries originating in Kansas from medical care received in Kansas should be addressed to and by the Kansas legislature.